**Deanna BARRETT, Plaintiff,**

v.

**OMAHA NATIONAL BANK, Defendant.**

No. CV 80–0–597.

United States District Court,
D. Nebraska.

July 13, 1983.

Jerold Fennell, Omaha, Neb., for plaintiff.

Soren Jensen, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

BEAM, District Judge.

This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff, Deanna Barrett, alleges that she was subjected to sexual harassment which caused her constructive discharge from the employ of defendant, The Omaha National Bank (ONB). Plaintiff further alleges that, as a result of voicing these charges of sexual harassment, she was subjected to certain retaliatory actions by defendant.[1] As a result,

---

1. At trial, plaintiff sought, for the first time, to introduce a cause of action based upon retaliation. Plaintiff requested leave to amend her Order on Pretrial Conference (Record at 273), in order to add such a claim, even though the issue had never before been raised, either in the administrative proceedings, the complaint, or the Order on Pretrial Conference.

The Court took plaintiff's motion to amend under advisement, and allowed plaintiff to adduce evidence with regard to her retaliatory claims, subject to being disregarded by the Court should it decide that the motion should be denied (Record at 273–75).

It is true that the constructive discharge issue and the proposed retaliation claim are hinged on the same set of operative facts, *i.e.,* failure to

separate the two employees, a review of plaintiff's loans, and a proposed time measurement study of plaintiff.

Although the issue of retaliation was not expressly raised at the administrative level, the issue of retaliation is reasonably related to the original charge and may be expected to grow out of that charge. 2 A. Larson, *Employment Discrimination* § 49.83(c) (1983 and 1983 Cum. Supp.). *See Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970).

Further, plaintiff argues that it would be in the interest of justice to allow amendment of the Order on Pretrial Conference. The Court agrees, especially in view of defendant's failure to show any prejudice which would be occasioned by the inclusion of a retaliatory cause of

she seeks injunctive and equitable (back pay [2]) relief.[3]

It is undisputed that plaintiff timely filed her sex discrimination complaint with the Nebraska Equal Employment Opportunity Commission (NEOC) and the Federal Equal Employment Opportunity Commission (EEOC). It is also undisputed that Deanna Barrett received a Right to Sue Letter from the EEOC, and did, within the statutory period of time, initiate her lawsuit in this federal court. 42 U.S.C. § 2000e–5(e). Therefore, the Court has jurisdiction over the parties and the subject matter of this action.

The facts, as the Court finds them from the competent evidence adduced during the six days of trial, are set forth in this Memorandum Opinion.

## BACKGROUND

Plaintiff, Deanna Barrett, is a female, and was age 31 at the time of the incidents complained of herein. Defendant ONB is a financial institution which has its principal place of business in Omaha, Nebraska. From roughly 1969 through 1979, Mrs. Barrett was employed in various positions with the defendant bank, and steadily received promotions; the last position she held with the bank being that of a Personal Banker, handling, for the most part, personal loans.

Timothy Day, not a party to this action, but most assuredly the pivotal actor in this scenario, was also an employee of ONB during the time in question here, and had been for approximately seven years. Mr. Day met Mrs. Barrett when he transferred to the main bank location in the latter part of 1977. He first transferred to the position of supervisor in the teller area, but was later moved, in approximately August of 1978, to the Personal Banking Department.

Upon Day's arrival in the Personal Banking Department it was Mrs. Barrett who was responsible for training him in the various procedures. Although Mrs. Barrett and Mr. Day did not socialize outside of the confines of ONB, they did consider themselves friends, and often chatted during breaks and at lunch time, as well as during less busy working hours. The topics of conversation were many and varied, ranging from work-related matters to more personal discussions involving their respective romantic relationships, as well as some discussions concerning their respective sex lives.

Another actor who was a central figure in this lawsuit, but not a party to this action, was William Legenza. Mr. Legenza was, at the times pertinent to this matter, the Assistant Manager of a branch location of ONB. He had, previous to that time, been the manager of teller operations at the main bank, and knew both Mr. Day and Mrs. Barrett only casually through his employment there, although he had previously worked directly with Mr. Day.

In December of 1978, plans were made for Day, Legenza, and plaintiff to attend a loan seminar to be held in Grand Island, Nebraska. The travel arrangements were made by Tim Day.

On Wednesday, January 17, 1979, the three co-employees: Day, Legenza, and Barrett, left Omaha in a rental automobile and proceeded to Grand Island, Nebraska. Mr. Legenza drove the vehicle the entire way, with Mrs. Barrett sitting in the middle of the front seat, and Mr. Day on the right side. It should be noted that one of the three could have occupied the back seat of the auto, but apparently none chose to do so.

---

action. Therefore, the Order on Pretrial Conference will be deemed amended to include the issue of action based on retaliation.

Notwithstanding this Court's allowance of the amendment in this limited circumstance, it is noted that eleventh-hour attempts at introducing novel issues are looked upon with disfavor by this Court.

**2.** Plaintiff claims that the equitable remedy of reinstatement would not be a viable one under the circumstances, and she, therefore, does not pray for it.

**3.** This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e–5(f)(3).

Plaintiff alleges that during the trip, she was subjected to sexual harassment from Mr. Day, which harassment manifested itself both verbally and physically.[4] The physical harassment, according to plaintiff, included a nonconsensual touching and rubbing of her thighs by Mr. Day, and the pressing of his arm into her breast. She also alleges that Day, under the facade of reaching for a bag of potato chips in plaintiff's lap, grabbed plaintiff in the crotch area. Plaintiff testified that she complained of this behavior to Mr. Legenza while Day was out of the car during stops, but that he took no action to remedy the situation.

Mr. Day and Mr. Legenza deny that any such harassment, either verbal or physical, took place. They further testified that any "touching" done by Mr. Day was unintentional and may have been caused by the fact that all three actors were sitting in the front seat of a mid-sized rental car. Mr. Day also specifically denies grabbing or pressing against plaintiff's crotch area with his hand. Mr. Legenza further denies that plaintiff ever voiced any displeasure to him as to Day's behavior.

When the three arrived in Grand Island, Legenza drove to a Holiday Inn, thinking that it was the motel at which they had secured reservations. Upon inquiry at the desk, however, it was discovered that their reservations were at another Holiday Inn in the area. When the three arrived at the correct motel, Day and Legenza went to the front desk to check-in, while Deanna Barrett waited in the rental auto.

After completing the paperwork, the two men returned to the auto and informed plaintiff that there had been a mistake made, and that the motel only had one room available for the three of them. After a few moments, however, it was disclosed that the two men were joking and

that there indeed were two rooms rented. The testimony conflicted as to Mrs. Barrett's knowledge that this was a joke.

That night, after changing clothes in their respective rooms, Day, Legenza, and plaintiff went out for dinner at a restaurant in Grand Island. After an uneventful dinner, the three of them went to a lounge at the Ramada Inn at which the seminar would be held. This Ramada Inn was located approximately one mile from the Holiday Inn at which the three were staying. Day, Legenza, and Barrett stayed at the Ramada Inn lounge for approximately fifteen to twenty minutes, after which they went to the lounge at the Holiday Inn in which they were staying. After about twenty minutes in that lounge, the three proceeded up to their rooms. Mrs. Barrett testified that Day and Legenza accompanied her to her room, and that, upon arrival Day laid on her bed and proceeded to make lewd sexual comments. Conversely, Day and Legenza claim that they did not go to Mrs. Barrett's room after leaving the Holiday Inn lounge, but rather went directly to their own room. Legenza testified that Mrs. Barrett may have visited their room for a few minutes, but that no sexual conversation took place.

Mrs. Barrett further testified that after she left the two men's room, she received a phone call which consisted only of heavy breathing and panting. Plaintiff assumed that the perpetrator was Day, and slammed the phone down. Within a few minutes after this call, plaintiff claims that there was pounding on the wall adjoining Day and Legenza's room. Day and Legenza testified that there were no such occurrences.

The next morning, Thursday, Deanna Barrett called her brother, a resident of nearby Kearney, Nebraska,[5] to inquire as

---

**4.** It is undisputed that Day and Legenza each consumed a few beers during the approximately three-hour drive to Grand Island, and that Ms. Barrett did not consume any. However, it is unclear as to the effect of that drinking on the two men. Ms. Barrett testified that she could tell the alcohol was affecting the men, but that

there were no glaring physical indications of intoxication, *i.e.* slurred speech, unsteady walk, swerving of the car.

**5.** The distance from Kearney to Grand Island is approximately 40 miles.

to whether he could transport her back to Omaha. She mentioned that she was having some trouble with the two men she had driven out with, but she did not disclose any specifics. She then called her mother's house in Omaha in order to speak with her daughter, who was staying there. She made no mention of her problems to either her daughter or her mother. Plaintiff then went to breakfast with Day and Legenza, after which the three of them went to the Ramada Inn for the seminar. After chatting with Messrs. Selk and Allen[6] from ONB, they proceeded to the seminar room.

During the meetings Mrs. Barrett sat between Day and Legenza, although there were a number of open chairs in the room. Plaintiff claims that Day continued physical contacts by placing his hands on her thighs and by rubbing against her breast. She claims that a number of the other people attending the conference could see these activities, but offered no evidence in support of this contention. Day denies that there was any such behavior on his part, and Legenza denies having seen anything by way of physical contact between Day and Barrett.

Following the meeting there was a hospitality hour at the Ramada. During the day there had been a severe ice storm which had left the Grand Island roads in very treacherous condition. Mrs. Barrett claims that, during the hospitality hour, Day and Legenza told her that they (the two men) were going to stay at the Ramada that night due to the weather, and that she would have to "fend for herself." Plaintiff further alleges that she told Mr. Allen of the problem and that he then chastized Day

and Legenza, instructing them to take her back to the Holiday Inn.

Mrs. Barrett also testified that she called her mother during that time to tell her generally of the problems she was encountering. She claims that she broke into tears and became very upset. Her mother corroborates this testimony.

However, Day and Legenza deny that they said anything to Mrs. Barrett with regard to "fending for herself." Further, they deny that Deanna Barrett seemed upset at the time. Two other ONB employees, Messrs. Selk (a senior loan officer) and Allen (a vice president), also deny that plaintiff appeared upset in any way, or that she voiced any complaints regarding the behavior of either Day or Legenza.

Once the car had been cleared of ice, Day, Legenza, and Selk took plaintiff back to the Holiday Inn, dropped her off, and then proceeded to dinner.[7]

Plaintiff then called her mother again to generally recount the situation to her. She talked some twenty-five minutes. After calling her mother, plaintiff called Mary Jochim, a former co-employee and professional acquaintance. She recounted the situation during the entire Grand Island trip, and that conversation lasted almost an hour. Again, the testimony shows that she was upset.

On the following day, Friday, Legenza, Day and plaintiff again sat together at the seminar, with Deanna Barrett sitting between the other two. No physical or verbal sexual abuse is alleged to have occurred at this session however.

---

It should be noted also that her brother, Greg Antill, was to begin employment with ONB as a pilot on the next Monday. It appears, then, that the trip to Omaha was not solely for the purpose of transporting Deanna Barrett, although no evidence was adduced with regard to that point.

6. Mr. Selk was, in January of 1979, the Senior Correspondent Agricultural Loan Officer, and Mr. Allen was Vice-President of the Correspondent Banking Division. Although both held a higher "rank" in the bank than Day, Legenza, or Barrett, neither had any direct supervisory control over any of the three.

7. Plaintiff claims that Day and Legenza did not want to take her back to the motel and that they suggested she be dropped off on the road in front of the Holiday Inn rather than entering the lot and dropping her near the door.

Day and Legenza claim that they did not suggest letting Deanna Barrett off in the street, but simply deposited her near her door. Mr. Selk suggested that there may have been concerns expressed by Legenza and Day, given the ice, about their ability to get out of the parking lot once they entered, but that he (Selk) assured them that they could get out.

**26**

At approximately 6:00 P.M. on Friday, Deanna Barrett's brother, Greg Antill, and his family picked her up from the Ramada Inn with her luggage and drove her to Omaha.

On Sunday evening, January 21, 1979, Mrs. Barrett attempted to call Tom Cooper, a bank vice president,[8] at his home. Mr. Cooper was not home at that time. However, at some point during Monday, January 22, Mrs. Barrett did have an opportunity to approach Mr. Cooper to tell him that she needed to speak with him privately regarding the situation in Grand Island. Mr. Cooper told her to call him that evening.

When she called that evening, at about 7:00 P.M., she generally related to Mr. Cooper all of the events of the Grand Island trip. After talking approximately forty-five minutes, the two of them agreed to talk again the next morning.

Cooper and plaintiff spoke the next morning for about an hour, during which time Mrs. Barrett spoke about the Grand Island incidents in a little more detail. After this meeting, Mr. Cooper relayed Mrs. Barrett's story to his immediate supervisor, Mel From. Cooper also went out to the branch bank at which Mr. Legenza was working, in order to get his side of the story. Legenza denied that any of the activities, save the joking about the room availability, took place.

Cooper also approached Day, who said that, although there may have been some good-natured kidding, no verbal or physical sexual harassment took place, either during the seminar or on the way to the seminar.

During Monday and Tuesday (January 22 and 23), Day and Barrett continued to work on the same floor in the Personal Banking Department. The desks were, and always had been, about fifteen feet directly to the side of each other. Nothing out of the

ordinary happened during those two days between the two of them, and little conversation took place, except the usual morning greetings.

After having spoken with all three actors, Cooper contacted Mr. From and Duane Feekin, who was the Assistant Director of Personnel at ONB on January of 1979. Mr. Feekin then notified Mark Ford, who was in charge of the Personnel Department during the one-day absence of its director, Don Adams. Mr. Ford then set into motion a formal investigation into the allegations. Ford interviewed Mrs. Barrett, and Feekin interviewed Messrs. Allen and Selk.

The results of these interviews were communicated to Donald D. Adams, the Director of Personnel and Support Services at ONB. Mr. Adams proceeded to personally interview Day, Legenza, and plaintiff and found, as the other interviewers had, that the accounts of Day and Legenza directly conflicted with that communicated by plaintiff. Upon completion of these interviews, Mr. Adams reported his impressions to John Woods, the Chairman of the Board and President of the defendant ONB.

On Thursday, January 25, 1979, a meeting was held to discuss the results of the investigation. Present at this meeting were John Woods, Don Adams, Mel From, and Howard Moldenhauer (ONB's general counsel).

The result of that meeting was a consensus that Day and Legenza had, to some extent, misbehaved, in Grand Island. However, ONB did not give full credence to all of Mrs. Barrett's descriptions of the events. As a result, Tim Day was reprimanded by Mel From and placed on probation for 90 days at ONB, for his "grossly inappropriate" conduct in Grand Island. Day was warned that any further miscon-

---

**8.** Mr. Cooper was the Vice President in charge of Personal Banking Services, and the direct supervisor of Mr. O'Gara.

Thomas Cooper first met Deanna Barrett in 1972 or 1973 when she served as his secretary for a short time. At that time, Mr. Cooper was the Manager of Retail Banking with ONB. Due to this prior contact, Ms. Barrett very much trusted and liked Mr. Cooper.

duct toward fellow employees would lead to his immediate termination.

Mr. From also reprimanded Bill Legenza, but to a lesser extent. Legenza was cited for failing to intervene on behalf of Mrs. Barrett. No probation was given Legenza, however.

Memos reflecting the disposition of the matter were placed in Day and Legenza's permanent personnel files.

Mrs. Barrett, of course, received no disciplinary action whatsoever. Upon learning of the decision of ONB with regard to Day and Legenza, however, Mrs. Barrett communicated her displeasure to Mr. Cooper.[9] It was apparently her feeling that the discipline was not severe enough.

Plaintiff continued to work for ONB for approximately one month after the bank's disciplinary decision was reached. During that time she remained at the same desk location, approximately fifteen feet to the side of Mr. Day's desk. There was some communication between Day and Barrett, but only of a professional nature.

At about that time, Mrs. Barrett began to experience a certain amount of discomfort in her working environment. She was constantly shaking, and had trouble holding back tears. She also perceived that the other ONB employees in the area were giving her the "cold shoulder." Although some of her problems may have been due to the Grand Island incident, there was an equal likelihood that her emotional problems also stemmed from other personal and physical problems she was experiencing. Physically, plaintiff had been working long hours at the bank, and was under a lot of strain, evidenced by dizziness, loss of weight, and weariness. These symptoms existed prior to the Grand Island trip. She also showed signs of hypoglycemia both prior to, and after the seminar.[10]

On the personal side, Mrs. Barrett testified that she wanted to spend more time with her daughter, who was in grade school at the time.

During this month-long period after her return from Grand Island, Mrs. Barrett was informed by Mr. O'Gara that she was to be the subject of a work-measurement study at ONB, along with certain "model" employees from other departments within the bank. These work-measurement studies involved having a specialist sitting with the employee at his/her desk for a week or longer, for the purpose of observing and timing various work functions of a given employee. From this data the bank is better able to compile standards against which to assess other employees' performances.

The evidence disclosed that Mrs. Barrett was aware, even prior to the Grand Island trip, that she had been chosen to be the subject of such a study. Mrs. Barrett, considered a model employee, had been the subject of several of these studies in the past. Although Mr. O'Gara perceived that the study may have put additional pressure on Mrs. Barrett because of the investigation, no action was taken to exclude Mrs. Barrett from the study. However, Mr. O'Gara, did, as plaintiff testified, tell her that if the work-measurement study became too unbearable for her, she was to inform him of that fact. As it turned out, plaintiff left the employ of ONB prior to the beginning of the study.

On February 22, 1979, plaintiff was called to Mr. O'Gara's desk for the purpose

---

9. Mr. Cooper was of the opinion that Tim Day should have been terminated for his actions. Although plaintiff places great weight upon this testimony, the opinion of one man, especially one who had no decision making authority in this instance, is of little import. That was simply Mr. Cooper's assessment of the credibility of the people involved in the incident, which certainly is not binding on either the bank or this Court.

10. At trial defendant objected to the testimony of Dr. Charles Graz on relevancy grounds. The Court heard the evidence and reserved ruling on the objection.

Upon review of the testimony of Dr. Graz, the Court finds it to be of marginal relevance, due to the fact that his diagnosis was made more than one year following the incidents complained of herein. However, defendant's objection is overruled and the testimony of Dr. Graz will be considered and given its appropriate weight.

of a review of some of her loans. She claims that she had never been subjected to this type of review in the past. However, the evidence showed that various types of loan reviews took place on a regular basis. Further, Mrs. Barrett's testimony showed clearly that other loan officers had loans being reviewed on February 22, 1979, evidenced by the presence of other officer's loan folders on Mr. O'Gara's desk.

On the afternoon of February 22, 1979, plaintiff left the bank because she was not feeling well and because she felt she needed to relax and to see a doctor. Mrs. Barrett used up a number of weeks of accrued sick leave and of accrued vacation time. At that time she had intended to come back to the bank.

In March of 1979, plaintiff requested and was granted a leave of absence in order to spend some more time with her daughter. Never once did she mention that her reasons for not returning to work stemmed from the mishandling of the Grand Island situation. Upon completion of her six-month leave of absence on September 24, 1979, Mrs. Barrett resigned her position with ONB.

After the NEOC and the EEOC found no basis for her claims of discrimination, plaintiff filed this action on October 3, 1980.

## DISCUSSION

*Sexual Harassment*

■ 42 U.S.C. § 2000e–2 provides, in pertinent part:

> It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to ... [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.

Included within this section is protection against sexual harassment in the workplace, since "[s]exual harassment erects barriers to participation in the work force of the sort Congress intended to sweep away by the enactment of Title VII." *Katz*

*v. Dole,* 709 F.2d 251 at 254 (4th Cir.1983), *citing Bundy v. Jackson,* 641 F.2d 934, 944 (D.C.Cir.1981).

The majority of the cases dealing with sexual harassment involve situations in which an employee refuses to accept a demand for sexual favors from a supervisory employee, which results in adverse employment consequences. B. Schlei & P. Grossman, *Employment Discrimination Law* 421 & n. 216 (2d Ed.1983). The standards for employer liability in those types of situations are well-established. *Id.* The instant situation, that of employer liability for sexual harassment by co-employees, is a fairly new area of the law, however.

The starting point is to examine the *EEOC Guidelines on Sex Discrimination,* specifically those relating to sexual harassment. 29 C.F.R. § 1604.11 (1982) is the codification of the guidelines. It provides, in pertinent part:

> Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

> .    .    .    .    .

> With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

*Id.*

No clear and tested burden of proof like that found in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) has emerged in the co-employee harassment area, except for that found in the recent Fourth Circuit decision in *Katz v. Dole, supra*, which this Court finds to be a fair and correct statement burden of proof in this area. In *Katz*, a two step analysis was utilized:

> First, the plaintiff must make a *prima facie* showing that sexually harassing actions took place, and if this is done, the employer may rebut the showing either directly, by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial. Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. This showing can also be rebutted by the employer directly, or by pointing to prompt remedial action reasonably calculated to end the harassment.

709 F.2d at 256. *See Continental Can Co. v. State*, 297 N.W.2d 241 (Minn.1980) (Minnesota Human Rights Act).

At the threshold, the argument is made that Day, Legenza, and plaintiff were not within the scope of their employment from the time that they left Omaha for Grand Island until the time that they returned. This Court expressly rejects that argument. It is clear that the three employees were sent to Grand Island, at ONB's expense, in order to broaden their knowledge in work-related areas. Further, they attended the seminar as ONB representatives. Therefore, Day, Legenza, and plaintiff were within the scope of their employment while traveling to and attending the seminar.

Having crossed that threshold, it becomes necessary to address the issue of whether plaintiff has made a *prima facie* showing that sexually harassing actions took place. Upon review of the evidence,

although it is conflicting, the Court finds that the activities of Tim Day amounted to "verbal or physical conduct of a sexual nature ... [which had] the effect of creating an intimidating, hostile, [and] ... offensive working environment"; that working environment being the trip to and the seminar at Grand Island.

However, the Court does wish to note that it does not give absolute credence to Mrs. Barrett's rendition of the facts. It is clear that Mrs. Barrett was not, in every instance, a mere bystander when it came to talk of sexual activity. Indeed, on occasion she spoke to Mr. Day about her relationship with her boyfriend. Therefore, it is doubtful that the general sexual talk shocked plaintiff as much as she would have this Court believe. That is not to say that the talk with regard to sex was not improper, however.

The Court expressly finds that Mr. Day overstepped the bounds of decency in his conversation and physical contact with plaintiff on the way to, and in, Grand Island.

Although it is clear that Tim Day's activities in Grand Island, taken in their totality, amounted to sexual harassment, the Court finds that Bill Legenza's behavior, although far from chivalrous, did not amount to sexual harassment.

The next issue to be dealt with is defendant's rebuttal, if any, of plaintiff's *prima facie* showing of harassment. This issue, in the Court's estimation, is the most difficult one to be addressed in this matter. ONB certainly did not meet its burden of showing that all of the events described by Mrs. Barrett did not happen, nor did they show that the advances by Mr. Day were trivial. The troublesome question is whether the events described were so isolated as to rebut the *prima facie* case.[11]

---

11.  For sexual harassment to state a claim under Title VII, it must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment. Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined with regard to the totality of the circumstances. *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982).

While the usual rule is that trivial or isolated events do not give rise to liability, this Court feels that the instant case warrants a different result. Not only was the harassment by Mr. Day of a serious nature, but it also took place away from home and, for a period, inside a vehicle from which there was no escape.[12] Therefore, the Court finds that defendant has not rebutted plaintiff's *prima facie* showing of sexual harassment.

The second step to this analysis, as mentioned previously, is determining whether plaintiff has met her burden of showing that ONB knew or should have known of the harassment, and took no effectual action to correct the situation.

The evidence is quite clear that ONB subsequently became aware of Tim Day's misbehavior while in and enroute to Grand Island. However, the Court does not credit plaintiff's testimony that she had expressed to Mr. O'Gara, prior to the seminar, genuine concerns as to Mr. Day's potential behavior on the trip. Further, the Court finds that Messrs. Selk and Allen, the other ONB representatives at the seminar, were not aware of the harassment.[13] Therefore, the first time ONB was effectively made aware of the problems was when Mrs. Barrett contacted Mr. Cooper upon her return to Omaha.

Upon learning of the misconduct, ONB launched an investigation into the matter, which eventually led to the finding that Tim Day's behavior was "grossly inappropriate" and that Bill Legenza did not behave as he should. These findings, however, were not expressly findings of sexual harassment, but that is of little import. The fact that ONB's investigation of the conflicting accounts of the Grand Island incidents led to a different description of the activities than that of this Court is not dispositive. What is dispositive is that discipline was meted out to both Day and Legenza in accordance with their relative culpabilities in the matter.

ONB, like every employer, should take whatever steps are necessary to stamp out sexual harassment in the workplace.

Mr. Day was placed on probation for a period of 90 days, with a warning that "should any misconduct toward any bank employees occur in the future, he would be terminated regardless of the formal probationary period." As a result of this probation, Mr. Day went fifteen months without receiving a pay raise, and had the letter of probation as a part of his personnel file for the duration of his employment at ONB.

Mr. Legenza was chastized for failing to intervene on behalf of plaintiff. As a result of the reprimand, he was passed at least over three times for promotion, and waited 18 months between pay raises. His letter of reprimand became a part of his personnel file also.

Based upon the disciplinary action, the Court finds that defendant acted swiftly (within four days), and took effectual disciplinary action to remedy the sexual harassment. Given the conflicting accounts, and the fact that there had been no problems of a similar nature from either Day or Legenza, ONB did not act unreasonably in failing to terminate either employee.

Further, although the better course might have been to physically separate the work locations of Barrett and Day after the investigation, it cannot be said, under the circumstances, that the bank acted unreasonably in not doing so. First, as the Court noted previously, the emotional problems which Mrs. Barrett was encountering did not arise solely or even predominately out of the Grand Island incidents and, therefore, the location of the desks was of little import.

---

**12.** Although Mrs. Barrett's moving to the back seat of the automobile might have cut down on the amount of physical harassment, the fact remains that she was a great distance from home and friends, and, in the Court's opinion, the harassment would have continued notwithstanding her seating in the automobile.

**13.** Even if Selk and Allen had been aware of Mr. Day's misbehavior, it is not certain that this knowledge would be attributable to ONB, as neither of these men had supervisory roles over these three employees. That question need not be reached, however.

Second, the desks were located approximately fifteen feet apart and they were located in what was referred to as a "fishbowl" due to the area's visibility and the attendant commotion. Therefore, it is unlikely that she would even notice Day's presence to a great extent.

Third, and most important, the evidence showed that Mrs. Barrett did not complain of the discomfort which allegedly existed as a result of Day's proximity.[14]

In any event the failure to separate Day and Barrett did not have a bearing on whether ONB took prompt remedial action to end the harassment. Although it may have been uncomfortable for plaintiff, moving the desks or the workplace would not remedy the sexual harassment. The remedial action was the probation.[15] Defendant, in this Court's opinion, is under no obligation to supply plaintiff with a stress-free environment, but only to take reasonable action to end harassment of which it is aware or should have been aware. Equally, the work-measurement study and the loan review do not impact the efforts of ONB to remedy harassment.

That is not to say, however, that all three of those events are not relevant to the issue of retaliation and constructive discharge arising therefrom.

Therefore, plaintiff's claim of sexual harassment against ONB must fail.

*Retaliation*

■ 42 U.S.C. § 2000e–3(a) provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter ....

The Court finds that plaintiff has failed to state a claim cognizable under section 2000e–3 in that her complaint to ONB following the Grand Island trip was based upon the actions of a co-employee. As such, that opposition was not opposition to an unlawful employment practice as contemplated by Title VII. "A co-employee, acting in an individual capacity, is incapable of committing an unlawful employment practice." *Silver v. KCA, Inc.*, 586 F.2d 138, 140 n. 1 (9th Cir.1978). *See* B. Schlei & P. Grossman, *supra*, at 534 ("the practice opposed must be an *employment practice* by an *employer* ...."). Therefore, the retaliation claim must fail.

Even if this claim were cognizable under 42 U.S.C. § 2000e–3, the Court finds that plaintiff has failed to carry her ultimate burden of proof under the standards enunciated in *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). *See Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318, 324 (D.Mass.), *aff'd*, 545 F.2d 222 (1st Cir.1976); *see generally* 3A. Larson, *Employment Discrimination* § 87.30 (1983 and 1983 Cum.Supp.). The failure to separate Day and plaintiff, the work-measurement study, and the loan review simply were not causally connected to the complaints about Tim Day's behavior at the seminar.

*Constructive Discharge*

■ In *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir.1981); the Eighth Circuit Court of Appeals held that in order "[t]o constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit." 646 F.2d at 1256. Although the fact that plaintiff has failed to establish ONB's liability for the sexual harassment and for retaliation probably moots the constructive discharge question, *see Schaulis v. CTB/McGraw-Hill, Inc.*, 496 F.Supp. 666, 676 (N.D.Cal.1980), the Court nonetheless expressly finds that plaintiff has not

---

**14.** Mrs. Barrett testified that she once mentioned that the close proximity of Tim Day may cause her discomfort, but there was no evidence of complaints of his proximity during the thirty days which she worked with Tim Day after the discipline was handed down.

**15.** The only unlawful employment practice which could have arisen here is ONB's failure to take prompt and appropriate action once it learned of Mr. Day's behavior.

proven the existence of an intent to force her resignation by ONB. In fact, as the Court noted previously, the reason for her voluntarily leaving the employ of the bank was, if at all, only partially attributable to the stress caused by the Grand Island incidents.[16] Therefore, plaintiff's constructive discharge claim must also fail.

### CONCLUSION

Although the Court sympathizes with the fact that plaintiff was subjected to sexual harassment by Tim Day, and although the Court finds such behavior reprehensible, to find ONB liable in this circumstance would be unfair.

Defendant took prompt and appropriate disciplinary steps to remedy the sexual harassment, and to make sure it did not recur, and there was an absence of proof that the bank somehow sought to get rid of Mrs. Barrett after the incident.

Therefore, an order dismissing plaintiff's complaint will issue contemporaneously herewith.

---

16. "An employee may not be unreasonably sensitive to his working environment. A constructive discharge arises only when a reasonable person would find conditions intolerable." *Johnson v. Bunny Bread Co.,* 646 F.2d at 1256.