**Lynn FALL, Plaintiff,**

v.

**INDIANA UNIVERSITY BOARD OF TRUSTEES and Daniel Cohen, Ph.D., Defendants.**

No. 3:96–CV–205.

United States District Court, N.D. Indiana, Fort Wayne Division.

July 23, 1998.

Brian J. Hurley, Douglas Alexa Koeppen and Hurley, Valparaiso, IN, for Plaintiffs.

Susan B. Tabler, Ice Miller Donadio and Ryan, Indianapolis, IN, John C. Hamilton, Doran Blackmond Ready Hamilton and Williams, South Bend, IN, Kelly A. Evans, Constance Baker Phillips, Ice Miller Donadio and Ryan, Indianapolis, IN, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

This matter is before the Court[1] on two motions for summary judgment filed on May 15, 1998; the first by Defendant the Board of Trustees of Indiana University ("the University"), and the second by Defendant Daniel Cohen ("Cohen").[2] On June 8, 1998, the Plaintiff, Lynn Fall, ("Plaintiff") filed response briefs to the motions of the University and Cohen, and Cohen and the University

filed their respective replies on June 19 and June 26, 1998.

On the very day that the University filed its reply, the Supreme Court handed down two decisions which arguably created new rules of law applicable to this case. *See Burlington Industries, Inc. v. Ellerth,* — U.S. —, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* — U.S. —, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Accordingly, the Court allowed the parties an opportunity to address these cases. The Plaintiff and the University filed supplemental briefs on July 9, 1998, and supplemental response briefs on July 16 and 17, 1998, respectively.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons hereinafter provided, the motions for summary judgment will be DENIED.

## II. FACTUAL BACKGROUND

The Plaintiff's amended complaint advances three counts: the first asserts a sex discrimination claim against the University pursuant to 42 U.S.C.2000e–2(a)(1), as amended ("Title VII"); the second asserts a state law battery claim against Cohen; and the third advances a claim under 42 U.S.C. § 1983 (" § 1983") against Cohen in his individual capacity.[3]

In early 1994, the Plaintiff, as a resident of Plymouth, Indiana, attended a meeting with IUSB representatives including Jacqueline Caul ("Caul"), IUSB's Director of Off Campus Programs. The purpose of the meeting was to generate interest in IUSB classes to be held in Plymouth. After the meeting,

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. The relevant events occurred on Indiana University's South Bend branch campus, ("IUSB"), which like the main campus in Bloomington and several other IU branch campuses is governed by the University's Board of Trustees.

3. Although Cohen filed coterminous with his motion for summary judgment a "Motion to Decline Maintenance of Supplemental Jurisdiction over Count II," the parties' summary judgment arguments do not address the merits of Count II, the state law battery claim. The Plaintiff's § 1983

claim asserts a violation of the equal protection clause of the Fourteenth Amendment, which requires the Plaintiff to "generally satisfy the contours of a sexual harassment claim under Title VII." *Jones v. Clinton,* 990 F.Supp. 657, 667 (E.D.Ark.1998) (citing *Trautvetter v. Quick,* 916 F.2d 1140, 1149 (7th Cir.1990)). We acknowledge that the standards for proving an equal protection claim under § 1983 are not exactly identical to proving a Title VII claim, *see id.* at 669 n. 11, but under the circumstances of this case our ruling on the motion for summary judgment as to the Title VII claim applies equally to the Plaintiff's § 1983 claim.

Caul approached the Plaintiff and inquired if she would be willing to represent IUSB on a part-time temporary basis to promote those classes. (Plnf. dep. at 87–89, 106.)

The Plaintiff was no stranger to IUSB, having previously been a student there, and later, an employee of a design/construction firm that solicited business from IUSB. (Plnf. dep. at 129–132.) In both instances, the Plaintiff became acquainted with Cohen in his role as Chancellor of IUSB. (*Id.*)

The Plaintiff accepted Caul's offer to be a liaison with the Plymouth community, and Plaintiff commenced her employment with IUSB in March of 1994, and in that capacity would have meetings with Cohen, albeit casual and brief. (*Id.* at 145–147.) Ultimately, the Plaintiff's position with IUSB grew to full-time employment with salary and benefits commensurate with the status of the job, although she was only in an "acting" position, meaning that the job was temporary and would need to be "posted" (i.e., she would have to reapply) at the end of one year, or by July 31, 1995. (*Id.* at 111, 506, 532.)

Caul, and not Cohen, is the person who hired the Plaintiff. (*See* Cohen dep. at 214–215.) In fact, Cohen was concerned about the effect of this new position on IUSB's budget. (*Id.* at 214.)

At any rate, on November 11, 1994, while on the IUSB campus, the Plaintiff received an e-mail message from Cohen. (Plnf. dep. at 153–54.) The message requested that the Plaintiff make an appointment to see him regarding legislative issues and the effect of the recent 1994 election. (*Id.* at 154.) The Plaintiff proceeded to Cohen's office to make the appointment. (*Id.* at 161–62.) However, Cohen was available, and indicated that he would be able to see the Plaintiff that day. (*Id.* at 162–63.)

When the Plaintiff entered Cohen's office, he closed the door behind her. (*Id.* at 173.) The two sat and talked about the state legislature until Cohen got a "look" on his face that made the Plaintiff uneasy. (*Id.* at 175.) The Plaintiff claims that Cohen then told her that the e-mail topic had been merely a "ruse" to get her into his office. (*Id.* at 175–76.) Feeling uneasy, the Plaintiff decided to leave. (*Id.* at 176.) However, as the Plaintiff stood to leave, Cohen put his arms around the Plaintiff and grabbed her "like a gorilla." (*Id.* at 178.) Cohen then started kissing her, forcing his tongue in her mouth, and started grappling with his hands down her blouse. Cohen succeeded in forcing his hand down the Plaintiff's blouse far enough to grope her breasts as he was grabbing her. (*Id.* at 179.) The Plaintiff was eventually able to break away from Cohen, stating at the same time, "I really have to go." (*Id.* at 180.) At that point Cohen stepped aside and opened the door for the Plaintiff to exit. (*Id.* at 180–81.) The Plaintiff left Cohen's office and immediately proceeded to a restroom where she vomited. (*Id.* at 186–88.) The Plaintiff describes the action in Cohen's office as an attack that made her feel paralyzed, terrified, and unable to physically resist. (*Id.* at 178, 184–86.)

The Plaintiff did not complain to anyone immediately following the incident. (*Id.* at 190–91.) However, she did attempt to avoid further contact with Cohen, which she was able to do since she only needed to occasionally visit the IUSB campus to pick up her mail. (*Id.* at 106–07.)

Nevertheless, the Plaintiff voluntarily attended a Christmas party hosted by Cohen the next month. (*Id.* at 194–95.) On this occasion, she merely said "Hello" to Cohen and continued on into the party. (*Id.* at 198–99.) She also had contact with Cohen at a school of business Christmas party at Caul's house which she voluntarily attended. (*Id.* at 200.) Thereafter, the Plaintiff's next contact with Cohen was on January 13, 1995, while the Plaintiff was attending a reception at an art department lecture. (*Id.* at 204.) At the reception, a food table was located a few feet from Cohen's office. (*Id.* at 204–05.) Although Cohen was not participating in the lecture, he exited his office to obtain something from the food table. (*Id.* at 205.) At the food table, Cohen and the Plaintiff engaged in conversation. The Plaintiff asked Cohen whether he had seen the attendance figures for Plymouth. (*Id.* at 207.) The Plaintiff relates that Cohen responded as follows: "Well, the Plymouth numbers look good but let's look at everybody else's num-

bers and, you know, there is probably going to be a cut in off-campus programs and we know where that cut will be." (*Id.* at 208.) The Plaintiff took this comment as meaning that her job would be the one "cut." (*Id.* at 208–11.) Nevertheless, the Plaintiff concedes that at the time she was hired the Chancellor was not pleased about spending money on her salary. (*Id.* at 500.) The Plaintiff contends that the food table conversation was Cohen's way of letting her know that she was going to be punished because she "didn't do what he wanted . . . ." (*Id.* at 652.)[4]

On February 23, 1998, the Plaintiff reported the November incident to Caul, her immediate supervisor. (*Id.* at 231.) Caul indicated to the Plaintiff that Caul had an obligation to take the information to her superior, Lester Lamon, Vice–Chancellor for Academic Affairs for the IUSB campus ("Lamon"). (*Id.* at 232.) At some point in the conversation, Caul indicated that this was not the first time that someone had complained about Cohen. (*Id.* at 238.) However, the Plaintiff decided to go to Lamon herself, which she did the same day. (*Id.*)

Lamon's first reaction upon hearing the Plaintiff's explanation of the November incident was to say "Oh no, not again," because it reminded him of a similar complaint that a female IUSB employee had made against Cohen in the fall of 1989. (Lamon dep. at 40–41.) Lamon then suggested that if the Plaintiff wanted to file a charge in the matter, she should meet with an affirmative action officer, but the Plaintiff hesitated, not feeling confident about speaking to "anybody on that campus who answered to Dan Cohen." (Plnf. dep. at 236.)

After a few days the Plaintiff spoke with Jack Tharp ("Tharp"), Vice Chancellor of Student Affairs at the Kokomo branch campus of Indiana University. (*Id.* at 238.) Tharp advised the Plaintiff to contact Shirley Boardman ("Boardman"), the University's Affirmative Action Director. (*Id.* at 242.) The Plaintiff unsuccessfully attempted to contact Boardman several times before finally speaking with her on March 5, 1998. (*Id.* at 243.)

Once notified of the Plaintiff's complaint, Boardman immediately launched an investigation, and told the Plaintiff the University was making the matter its "highest priority." (*Id.* at 494.) Boardman interviewed the Plaintiff, informed Cohen that the Plaintiff had brought a charge against him, and supervised the interviews of at least thirty witnesses. (Boardman dep. at 27, 37, 42.) Boardman ultimately recommended that University Counsel Dorothy Frapwell advise University President Myles Brand to take "quick, appropriate and definitive action" against Cohen. (*Id.* at 49.) Cohen ultimately entered into an agreement with the University in which he resigned as Chancellor of IUSB and took a one-year sabbatical, a result based, at least in part, upon the University's investigation of the November incident and the resulting report.[5]

The University never notified the Plaintiff of the results of Boardman's investigation, or of Cohen's resignation. (Plnf. dep. at 546, 549.)

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

---

4. The Plaintiff originally relied on this conversation to support a *quid pro quo* harassment claim. The *Burlington* and *Faragher* decisions make clear that a *quid pro quo* claim is not in itself an actionable claim, but merely serves to illustrate a particular kind of hostile environment. In any event, the Plaintiff appears to have abandoned any reliance upon this conversation to prove her Title VII and § 1983 claims, and we shall therefore focus our attention on the single alleged incident of harassment in Cohen's office.

5. Boardman's final report (hereinafter "Investigative Report"), as well as documents relating to Cohen's resignation as Chancellor, have been sealed by the Court. However, in a telephone conference held July 14, 1998, counsel for all parties agreed that the Court could consider all of these documents in ruling on the motions for summary judgment, rendering the Plaintiff's June 3, 1998, "Motion to Strike or for Relief from Protective Order" MOOT. As we shall see, the Investigative Report is of some import in evaluating the University's affirmative defense, but so as to protect the confidentially of the Investigative Report at this stage of the proceedings the Court will only refer to it in a rather oblique manner.

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512, 106 S.Ct. 2505; *North American Van Lines, Inc. v. Pinkerton Security Systems, Inc.,* 89 F.3d 452, 455 (7th Cir.1996); *In Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson,* 477 U.S. at 249–51, 106 S.Ct. at 2511; *North American Van Lines, Inc.,* 89 F.3d at 455. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

In any event, in employment discrimination matters, the standard on summary judgment is applied with "added rigor." *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038

(7th Cir.1993); *see Wohl v. Spectrum Mfg.*, 94 F.3d 353, 355 (7th Cir.1996). As the Seventh Circuit reiterated in *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159, 1162 (7th Cir.1994), citing the standard set out in *Sarsha*:

> Summary judgment is appropriate only when the materials before the court demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. Accordingly, we will affirm the decision of the district court only if, had the record before that court been the record of a complete trial, the defendant would have been entitled to a directed verdict.[6] [citations omitted].

## IV. DISCUSSION

 This case involves an allegation of sexual harassment by a supervisor, and thus falls squarely within the purview of the Supreme Court's recent "redefinition" of this jurisprudence as stated in the *Burlington* and *Faragher* decisions. To the extent applicable here, the holding of the Supreme Court can be encapsulated as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington*, —— U.S. at ——, 118 S.Ct. at 2270; *Faragher*, —— U.S. at —— – ——, 118 S.Ct. at 2292–93. The Supreme Court further explained that "tangible employment action" includes a "discharge, demotion, or undesirable reassignment." *Faragher*, —— U.S. at ——, 118 S.Ct. at 2293 (citing *Burlington*, —— U.S. at ——, 118 S.Ct. at 2269). However, we need not address this new pronouncement of employer liability if the sexually objectionable environment created by a supervisor does not rise to a level actionable under Title VII. *See, e.g., Burlington*, —— U.S. at ——, 118 S.Ct. at 2265; *Faragher*, —— U.S. at —— – ——, 118 S.Ct. at 2282–83. Therefore, we shall first turn our attention to the hostile environment analysis as first articulated by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and later refined in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and *Oncale v. Sundowner Offshore Services, Inc.*, —— U.S. ——, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

### A. Actionable Hostile Environment

"It is well established that 'a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.'" *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1143 (7th Cir.1997) (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405). "[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, —— U.S. at ——, 118 S.Ct. at 2283 (*citing Harris*, 510 U.S. at 21–22, 114 S.Ct. at 370–71). This inquiry eliminates any requirement that a plaintiff demonstrate that the harassment adversely affected his or her work performance or psychological well being, and focuses the inquiry on whether the harassment discriminatorily alters the terms and conditions of his or her employment. *See Oncale*, —— U.S. at

---

**6.** The anachronistic term "Directed Verdict" is no longer used; rather, it has been more accurately retitled "Judgment as a Matter of Law." *See* Fed.R.Civ.P. 50(a). A defendant is entitled to such a judgment if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the plaintiff. *Id.*

——, 118 S.Ct. at 1003; *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1455 (7th Cir.1994) (citing *Harris,* 510 U.S. at 25, 114 S.Ct. at 372 (Scalia, J., concurring)).

The Supreme Court has consistently counseled that the test for whether an environment is "hostile" or "abusive" is not a mathematically precise one, but requires the court to look at all the circumstances and consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher,* —— U.S. at ——, 118 S.Ct. at 2283 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. at 371). Of course, the harassment must also have occurred because of the Plaintiff's sex. *Oncale,* —— U.S. at ——, 118 S.Ct. at 1002.

To be sure, exactly what act or combination of actions may "objectively" constitute a hostile work environment is a rather gray area. The Supreme Court has cautioned that the standard for judging hostility must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code,'" *Faragher,* —— U.S. at ——— ——, 118 S.Ct. at 2283–84 (citing *Oncale,* —— U.S. at ——, 118 S.Ct at 1002), and has noted that the correct standard when properly applied will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* at 2284 (quoting B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 175 (1992)) ("LINDEMANN & KADUE"). In other words, only extreme conduct can be said to discriminatorily alter the terms and conditions of employment. *Id.* (citations omitted). Moreover, the Supreme Court has repeatedly emphasized that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale,* —— U.S. at ——, 118 S.Ct. at 1003 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. at 371). In the words of Justice Scalia:

The inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office ... Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id.*

Similarly, the Seventh Circuit has suggested that the inquiry be balanced in terms of "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." *Baskerville v. Culligan International Co.,* 50 F.3d 428, 431 (7th Cir.1995) (citing *Carr v. Allison Gas Turbine Division,* 32 F.3d 1007, 1010 (7th Cir.1994)). As Judge Posner explained in *Baskerville,*

On the [sexual harassment] side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures.

\* \* \* \* \* \*

On the other side [of the line] lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Id.* at 430 (internal citations omitted). This analysis takes proper heed of the Supreme Court's mandate to evaluate all the relevant circumstances, for under this balancing approach a single act can create a hostile environment if it is severe enough, while a number of arguably objectionable actions may not. *Compare id.* at 431 (several less offensive comments and conduct spread over a period of time do not create a hostile work environment); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526 (7th Cir.1993) (same); and *Weiss v. Coca–Cola Bottling Co. of Chi-*

*cago,* 990 F.2d 333 (7th Cir.1993) (same), with *DiCenso v. Cisneros,* 96 F.3d 1004, 1008 (7th Cir.1996) (recognizing that a single incident of harassment may support an actionable hostile environment claim) (citing *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1345 (7th Cir.1995); *King v. Board of Regents of University of Wisconsin Sys.,* 898 F.2d 533, 537 (7th Cir.1990)).

## B. Analysis

▉ The subjective inquiry need not detain us long in this case. After all, the incident caused the Plaintiff to vomit immediately afterwards, and she later explained that the experience made her feel paralyzed and terrified. Clearly, the Plaintiff has at least raised a genuine issue of material fact as to whether she subjectively perceived Cohen's actions to be hostile or abusive. Therefore, the Court shall focus its analysis on whether the conduct alleged by the Plaintiff, when viewed objectively, "crosses the line" and rises to the level of severity required to support a hostile environment claim.

Predictably the University relies on the Seventh Circuit cases of *Saxton* and *Weiss,* as well as *Baskerville* and a recent summary judgment opinion from this district, *Hostetler v. Quality Dining, Inc.,* 1998 WL 456436, No. 3:97–CV–160RP, slip. op. (N.D. Ind. April 23, 1998) (Pierce, M.J.), to argue that Cohen's actions do not rise to the level of actionable sexual harassment.[7] *See generally* 1 B. LINDEMANN & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 805–07 n. 290 (3d ed.1996) (collecting cases, including *Saxton* and *Weiss,* which granted summary judgment for employers because the alleged harassment was not actionably severe or pervasive). However, the facts of the instant case are distinguishable in several material respects from those of *Saxton, Weiss, Baskerville,* and *Hostetler,* differences which illustrate that Cohen's conduct was much more hostile and intimidating than that described in the cases cited by the University.

First, Cohen's statement to the Plaintiff that his request for a meeting with her was a mere ruse to lure her into his office supports an inference that Cohen's attack on the Plaintiff was calculated in advance, and that he engineered a scenario that would best accommodate his preplanned forceful sexual advances. This element of premeditation is absent from the relatively spontaneous behavior described in the cases cited by the Defendant, and in our view adds a degree of severity and abusiveness to Cohen's unacceptable conduct that is not present in those cases.

Second, the setting and accompanying social context in which Cohen's harassment occurred suggests that this incident was more abusive and hostile than the activity described in the cases cited by the University. *See Oncale,* —— U.S. at ——, 118 S.Ct. at 1003 ("[the] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the target."). Cohen's acts took place in the confines of Cohen's office, behind closed doors, rather than in a social setting, where romantic misunderstandings are not uncommon, or out in the open where the Plaintiff could easily escape Cohen's advances. *See Saxton,* 10 F.3d at 534 (plaintiff's ability to make clear that the harasser's advances were

---

7. The facts of *Hostetler* were as follows:

 The female plaintiff alleged that a male co-worker (both were employees of a fast food restaurant) physically sexually harassed her on two occasions. First, she claimed that the co-worker grabbed the female plaintiff's face during business hours and forcibly tried to kiss her, or "stuck his tongue down her throat." *Hostetler,* slip. op. at 6. The next day, the co-worker attempted to again grab the plaintiff's face and turn it toward him. The plaintiff, who was seated, resisted and put her head between her knees to prevent him from reaching her face. The co-worker then placed his hands on her back, grabbed her bra, and proceeded to undo one of the hooks. (The opinion does not explain wheth-

er the co-worker managed to unhook the bra from outside her shirt, or whether he placed his hands inside her shirt on her back. In any event, the co-worker did not reach around the plaintiff and grope her breasts.) At this point another employee walked in, ending the altercation. The Plaintiff also reported that the co-worker had at another time directed a terribly vulgar comment to her in front of customers, but no further harassment occurred beyond these incidents. *Id.* at 6–7. Magistrate Judge Pierce believed that the nature and frequency of the conduct was *similar* to that described in *Weiss,* and held that given the totality of the circumstances, the incidents did not rise to the level of pervasive harassment as defined in Title VII. *Id.* at 17–19.

unwelcome limited the harassing nature of the advances); *Barrett v. Omaha Nat'l Bank,* 584 F.Supp. 22, 24, 30 (D.Neb.1983), *aff'd* 726 F.2d 424 (8th Cir.1984) (one incident of offensive touching while inside a vehicle from which the plaintiff could not escape was sufficient to constitute sexual harassment); *see also Zastrow v. Ikegami Electronics, (U.S.A.) Inc.,* 1997 WL 827456, at *4 n. 4 (D.N.J. Dec.2, 1997) (distinguishing *Saxton,* in which a supervisor's romantic advances were rebuffed in an intimate social setting, from a supervisor's attempts to grab the plaintiff's breasts at professional gatherings). That is, Cohen's alleged actions, as deplorable as they would be in any setting, are objectively more sinister and abusive given that they·occurred in the isolation of the Chancellor's office. *Cf. Baskerville,* 50 F.3d at 431 ("Remarks innocuous or merely mildly offensive when delivered in a public setting might acquire a sinister cast when delivered in the suggestive isolation of a hotel room.").

Finally, and most importantly, the physical nature of Cohen's harassment is drastically more severe and abusive than any conduct described in the cases cited by the University. Cohen's harassment did not consist of vulgar comments directed at the Plaintiff, or mere attempts to kiss the Plaintiff or rub his hand along her legs at a bar. Rather, Cohen, in his office with the door closed, forcibly grabbed and kissed the Plaintiff while forcing his hand inside her blouse to grope her breasts, a very private and intimate part of a woman's body. Consequently, we cannot accept the University's argument that the facts of this case are squarely governed by the Seventh Circuit cases of *Baskerville, Saxton,* or *Weiss.*

Indeed, while the fact remains that the Plaintiff has alleged only a single, isolated incident of sexual harassment, the Seventh Circuit has clearly indicated that a single incident of harassment may support an ac-

tionable hostile environment claim. *See DiCenso,* 96 F.3d at 1009 (citations omitted). However, the Seventh Circuit has never directly addressed how abusive a single incident must be in order to support an actionable hostile work environment claim. This is not to say, however, that the Court is without guidance on this question. Case law from other jurisdictions, together with guidance from the Equal Opportunity Employment Commission ("EEOC"), the federal agency charged with enforcing Title VII, *see* 42 U.S.C.2000e–4(a), provide a useful analytical framework, particularly in light of Justice Scalia's admonition in *Oncale* to employ common sense and an appropriate sensitivity to the social context in which the event occurred.

In fact, the EEOC believes that the very nature of Cohen's objectionable behavior—a physical, forced groping of an intimate part of the Plaintiff's body—creates an actionable hostile work environment.

> The [EEOC] will presume that the unwelcome, intentional touching of a charging party's intimate body parts is sufficiently offensive to alter the conditions of her employment and constitute a violation of Title VII. More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment. If an employee's supervisor sexually touches that employee, the [EEOC] normally would find a violation.

EEOC Policy Guidance on Sexual Harassment, 8 FAIR EMP. PRAC. MAN. (BNA) 405:6691 (March 19, 1990). ("EEOC Policy Guidance Manual").[8] *Cf. DiCenso,* 96 F.3d at 1009 (single incident did not rise to the level of a hostile environment; the harasser "did not touch an intimate body part" or threaten physical harm); *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 464 (7th Cir.1990) (apparently assuming that a single incident

---

**8.** The Court acknowledges that the EEOC Policy Guidance Manual does not have the force of law, but we note that the Supreme Court as well as several other federal courts have cited the Manual approvingly. *See Burlington,* — U.S. at —, 118 S.Ct. at 2270; *Faragher,* — U.S. at —, 118 S.Ct. at 2292; *DeNovellis v. Shalala,* 124 F.3d 298, 311 (1st Cir.1997); *King v. Hillen,* 21

F.3d 1572, 1580 (Fed.Cir.1994); *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991); *Blakey v. Continental Airlines, Inc.,* 992 F.Supp. 731, 742 (D.N.J.1998); *Alvey v. Rayovac Corp.,* 922 F.Supp. 1315, 1330 (D.Wis.1996); *Perkins v. General Motors Corp.,* 709 F.Supp. 1487, 1499 (W.D.Mo.1989).

where a supervisor picked up the plaintiff's arms, set her down on a chair, and forced his face against her crotch created an actionable hostile environment).

Moreover, several courts and leading commentators agree that single incidents of severe physical harassment akin to a sexual assault will constitute actionable sexual harassment. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995) ("even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability") (citing *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405); *Jones v. Clinton*, 990 F.Supp. 657, 675 (E.D.Ark.1998) (recognizing that "a single incident of sexual harassment, such as a sexual assault" may be deemed sufficient to state a claim of hostile work environment harassment) (citing *Crisonino v. New York City Housing Auth.*, 985 F.Supp. 385 (S.D.N.Y. 1997)); *Redman v. Lima City Sch. Dist. Bd. of Education*, 889 F.Supp. 288, 293 (N.D.Ohio 1995);[9] *Barrett*, 584 F.Supp. at 30 (one incident of offensive touching while inside a vehicle from which the plaintiff could not escape was sufficient to constitute sexual harassment); LINDEMANN & KADUE at 176 ("Physical incidents may constitute actionable sexual harassment even if they occur but once."). *Accord Baskerville*, 50 F.3d at 430–31 (placing sexual assaults and unwanted physical contact on the "hostile or deeply repugnant" side of the line demarcating the boundary of actionable sexual harassment).

We believe that a reasonable jury, applying their common sense to the social context of the professional setting in which the alleged events occurred, could find that the Plaintiff was a victim of a sexual assault actionable under Title VII.[10] Consequently, under *Burlington* and *Faragher*, the Plaintiff has, for the purposes of summary judgment, established vicarious liability on the University for Cohen's actions.

## C. Affirmative Defense

■ The Plaintiff's supplemental briefs addressing *Burlington* and *Faragher* do not argue that she suffered any adverse tangible employment action linked to Cohen's harassment. Therefore we move on to consider whether the University has met its burden of showing that it exercised reasonable care to prevent and promptly correct Cohen's sexually harassing behavior, and that the Plaintiff unreasonably failed to take advantage of any of the preventive or corrective opportunities provided; in short, whether the University has established as a matter of law the new affirmative defense created by *Burlington* and *Faragher*.

### 1. Reasonable Care

The Supreme Court's *Burlington* and *Faragher* decisions break new ground in cases of supervisory sexual harassment by establishing vicarious liability for employers, ameliorated somewhat by a possible affirmative defense. The first element of the defense, that the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior on the part of a supervisor, is akin to the familiar negligence showing that plaintiffs were formerly required to

---

9. The act of harassment in *Redman*, which involved a school principal assaulting a teacher, is factually similar to Cohen's act:

> Hampshire invited plaintiff to join him in the boiler room. When plaintiff refused, Hampshire put his hand on the back of her neck and led her down the basement stairs. In the basement, Hampshire forced the plaintiff against the wall. Hampshire proceeded to fondle and rub against the plaintiff in a sexual manner. Plaintiff protested against Hampshire's actions. In response to Hampshire's unwelcome advance, plaintiff vomited. After plaintiff was sick, Hampshire released her and left the basement.

*Redman*, 889 F.Supp. at 291.

10. We note that the University's brief in support of its motion for summary judgment qualifies Cohen's touching of the Plaintiff's breasts by parenthetically noting that Cohen's groping occurred over, rather than under, the Plaintiff's bra. ' *See* Def. Br. in Supp. at 8. To the extent this qualification is an attempt by the University to gloss over the severity of Cohen's actions, it misses the mark. The Court is at a loss to understand the distinction in the egregiousness of Cohen's conduct, or its effect on the Plaintiff's conditions of employment, between forcing his hand inside her blouse to grope her breasts, as opposed to under her bra. In any event, the Plaintiff testified that although Cohen's hand did not make it fully inside her bra, he did manage to touch her flesh. *See* Pl. dep. at 179–80.

make out as part of their case-in-chief under previous Seventh Circuit precedent. *See Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir.1997); *Baskerville*, 50 F.3d at 432 ("The employer's duty is thus discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees."); *Guess*, 913 F.2d at 465. Thus, we shall proceed with the first element of the affirmative defense under the usual "knew or should have known" negligence analysis. *E.g., Juarez*, 957 F.2d at 320 (employer is liable for sexual harassment only if it knew or should have known of the employee's acts of harassment).

The Defendant vigorously argues that it acted with reasonable care to promptly *correct* the sexual harassment endured by the Plaintiff, and we are inclined to agree. The University had an anti-sexual harassment policy in place during the relevant time period, which the Plaintiff took advantage of, albeit three months after the incident. Indeed, once the Plaintiff registered her complaint to the appropriate officials, the University immediately launched an expansive investigation into the matter, which resulted in Cohen's resigning his position as Chancellor. Consequently, we do not find any triable issue of fact as to the University's response to the Plaintiff's complaint.[11]

■ However, the primary objective of Title VII is not to provide redress for harassed employees, but to avoid the harm in the first place. *Faragher*, ―― U.S. at ――, 118 S.Ct. at 2292 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975)); *see also* 29 C.F.R. § 1604.11(f) (advising employers to "take all steps necessary to prevent sexual harassment from occurring"). Thus, the af-

firmative defense requires employers to prove that they exercised reasonable care not only to promptly *correct* any sexually harassing behavior, but also to *prevent* such behavior from occurring. Unfortunately for the University, the same Investigative Report which illustrates the great care taken in *correcting* the harassment of the Plaintiff raises genuine issues of material fact as to whether the University was negligent in *preventing* Cohen's harassment of the Plaintiff from occurring in the first place.

As mentioned *supra*, an employer is only obligated to prevent sexual harassment by a supervisor if it actually knew, or in the exercise of reasonable care should have known, (i.e., had notice) that the supervisor had a history of harassing behavior. *See EEOC v. Mitsubishi Motor Manufacturing of America, Inc.*, 990 F.Supp. 1059, 1072 (C.D.Ill. 1998) ("without notice there cannot be negligence") (citing, *inter alia, Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1019 (7th Cir.1996)). It is well established that an employer's notice may be actual or constructive. *See, e.g., Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996) (citations omitted). As the Seventh Circuit recently explained, an employer is said to have actual notice of harassment when such information either comes to the attention of someone who has the power to terminate the harassment, or it comes to one who can reasonably be expected to report or refer a complaint "up the ladder" to someone who can put an end to it. *Young*, 123 F.3d at 674 (relying upon *Torres v. Pisano*, 116 F.3d 625, 634–38 (2d Cir.1997), and *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715–16 (2d Cir.1996)); *see also* LINDEMANN & KADUE at 241–42 ("Courts will find actual knowledge on the part of the employer where com-

---

11. The Plaintiff's argument on this point is that the University cannot demonstrate the reasonableness of its corrective actions without referring to the Investigative Report, and that a question of fact remains as to the effectiveness of its final disciplinary decision. *See* Pl. Supp. Resp. Br. at 3–4. However, as noted *supra* the Court is free to consider the Investigative Report, which details the University's thorough and intensive efforts to discover and rectify Cohen's alleged harassment of the Plaintiff. The test applied to the employer's remedial actions is one of reasonableness, not whether the remedial actions were

ultimately successful, and despite the gravity of the Plaintiff's allegations we find as a matter of law that the University used reasonable care to promptly correct Cohen's harassment of the Plaintiff. *See, e.g., Baskerville*, 50 F.3d at 432. Moreover, the University's corrective actions were in fact completely successful (in that Cohen never again harassed the Plaintiff), and thus no genuine issue of material fact remains as to the effectiveness of the University's final course of action. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 481 (7th Cir.1996).

plaints of [ ] harassment have been lodged with any representative of the employer who holds a position sufficiently high within the organization to make notice to that person notice to the employer.").

■ On the other hand, an employer may be charged with constructive knowledge of previous sexual harassment by a supervisor, even if unreported, if the harassment was so broad in scope, and so permeated the workplace, that it must have come to the attention of someone authorized to do something about it. *See Mitsubishi Motor*, 990 F.Supp. at 1072 (quoting *Young*, 123 F.3d at 674 (citing *Zimmerman*, 96 F.3d 1017, 1018–19 (7th Cir.1996); *Waltman v. International Paper Co.*, 875 F.2d 468, 478 (5th Cir.1989); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988))); *see also Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 673–74 (10th Cir.1998) ("highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level employees"); LINDEMANN & KADUE at 242–44. *Cf. Ammerman v. Sween*, 54 F.3d 423, 425 (7th Cir.1995) ("An employer has a legal duty to take reasonable steps to *discover and rectify* acts of sexual harassment of its employees.") (emphasis added, citing *Baskerville*, 50 F.3d at 431–32). Moreover, the employer's knowledge of the harassment, whether actual or constructive, need not be complete, but merely enough to make a reasonable employer think there was *some probability* that the harassment was taking place. *Perry*, 126 F.3d at 1014 (quoting *Zimmerman*, 96 F.3d at 1019).

■ The record here reveals at least a reasonable inference that the University had, for the purposes of summary judgment, actual notice through both Caul and Lamon that Cohen had a history of inappropriate sexual behavior towards female IUSB employees prior to the incident with the Plaintiff.[12] According to the Plaintiff, after she explained to Caul what had happened, Caul told her that "it wasn't the first time." (*See* Plnf. dep. at 238.) The Court may reasonably infer from this statement that Caul had actual knowledge of other complaints pertaining to previous alleged acts of sexual harassment by Cohen.

Similarly, Lamon's first reaction to the Plaintiff's description of Cohen's alleged harassment supports an inference that Lamon was aware of a previous complaint of sexual harassment against Cohen. According to the Plaintiff, Lamon remarked "Oh no, not again," after listening to her description of Cohen's acts. (Lamon dep. at 40–41.) Lamon explained in his deposition that this reaction was based upon his knowledge of a similar complaint he received about Cohen in late 1989, in which a female IUSB employee alleged that she had gone into Cohen's office to perform some computer work, and that Cohen had closed the door and kissed her. (*Id.* at 41–42.) Although the University investigated the incident, it took no corrective action, apparently because the victim did not want any further action taken. (*Id.*)

The University argues that the "10–year old unproven allegation" described by Lamon is insufficient to provide actual notice to the University of Cohen's history of sexual harassment, but we must disagree.[13] Viewed

---

**12.** There is no question that Caul and Lamon are employees whose notice of sexual harassment can be imputed to the University. The University's sexual harassment policy, which the University explains is distributed to all·employees, outlines a complaint procedure which directs individuals who believe that they have been harassed to notify, *inter alia*, their supervisor or an academic or student services dean or official. *See* Drew. aff. attachment (University Sexual Harassment Policy). Thus Caul, a supervisor (as evidenced by the fact that she was the Plaintiff's supervisor) and Lamon, Vice–Chancellor for Academic Affairs, were clearly held out by the University's policy as employees who had a duty, or reasonably could be expected to have a duty, to act upon complaints of sexual harassment. *See*

*Young*, 123 F.3d at 674–75. Indeed, the University appears to concede as much by contending that the Plaintiff's complaint to Caul represented an appropriate (although untimely, *see* discussion *infra*) use of the sexual harassment policy.

**13.** The Defendant's characterization of this complaint to Lamon is somewhat disingenuous, since Lamon's knowledge of that complaint was less than four years old at the time of his "Oh no, not again" remark to the Plaintiff. *See* Def. Supp. Resp. Br. at 4 n. 3. Moreover, it could also be inferred from the 1989 complaint that Cohen had engaged in sexual harassment of IUSB female employees for years prior to the incident alleged here.

in a light most favorable to the Plaintiff, Lamon's "Oh no, not again" comment, together with Caul's acknowledgment that she was aware of other instances of harassment by Cohen, support a reasonable inference that Caul's and Lamon's knowledge of Cohen's harassment went beyond that of a single antiquated incident. Indeed, untempered statements like "Oh no, not again," and "it's not the first time" give rise to an inference that the speaker has a depth of knowledge going beyond some singular event. Therefore, on this record, we cannot say as a matter of law that Caul and Lamon did not have actual knowledge of Cohen's alleged previous sexual harassment.

Even assuming that the University had no actual knowledge Cohen's history of sexual harassment, the record clearly supports an inference of constructive knowledge. The Investigative Report reveals that prior to Cohen's harassment of the Plaintiff, a substantial number of female employees at IUSB were actual victims of alleged similar harassment by Cohen, or were at least aware of similar harassment, even though these incidents were not formally reported. This leads to an inference that Cohen's sexual harassment of women was so pervasive and well-known on the IUSB campus that the University, in the exercise of reasonable care, should have discovered it; or perhaps more ominously, that University personnel with the authority to do something about the harassment actually knew of Cohen's misbehavior, but refused to act. *E.g. Young,* 123 F.3d at 674 (citations omitted). Put another way, "[t]he record of this action contains evidence which suggests that an atmosphere of inappropriate sexual behavior may have permeated [IUSB]." *Allen v. Tyson Foods,*

*Inc.,* 121 F.3d 642, 647 (11th Cir.1997) Therefore, summary judgment is precluded because we find that this evidence is sufficient to create a genuine issue of material fact as to whether the University had constructive notice of Cohen's sexual harassment of women, yet did nothing to prevent its reoccurrence.[14]

The Court's conclusion that the University had both actual and constructive notice of Cohen's history of sexual harassment means that summary judgment must be denied because *Burlington* and *Faragher* place the burden of showing reasonable care in preventing sexual harassment on the University. Thus, to prevail on summary judgment the University must not only carry its burden of persuasion on the knowledge issue, but must also demonstrate that there is an absence of evidence to support the Plaintiff's argument that the University had knowledge of previous sexually harassing behavior by Cohen; in short, the University must show that on this record it would be entitled to judgment as a matter of law at trial on this issue. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554; *see also* WILLIAM SCHWARZER, ALAN HIRSCH & DAVID BARRANS, FEDERAL JUDICIAL CENTER, THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS: A MONOGRAPH ON RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE 45–46 (1991) (citing *Celotex,* 477 U.S. at 331–32, 106 S.Ct. at 2557 (Brennan, J., dissenting)).

In sum then, the actual notice by Caul and Lamon of previous incidents of Cohen's harassment, as well as the seeming pervasiveness of Cohen's behavior, clearly demonstrates some evidence of knowledge. Therefore, on this record, the University cannot meet its burden under *Burlington* and *Far-*

---

14. The University appears to contend that the second element of the newly-created affirmative defense set out in *Burlington* and *Faragher* actually writes constructive notice out of the reasonable care inquiry of the first element of the defense. *See* Def. Supp. Resp. Br. at 4 n. 3. We do not believe that this is what the Supreme Court intended, for as explained *supra,* the first element of the affirmative defense requires that the employer exercise "reasonable care to prevent and correct promptly any sexually harassing behavior." It is hornbook law that the term "reasonable care" defines the traditional negligence standard, which, of course, requires proof

that the University knew or *should have known* that Cohen's sexual harassment was taking place, and did nothing to prevent its continuance. *See, e.g., Smith v. Metropolitan Sch. Dist. Perry Township,* 128 F.3d 1014, 1030 (7th Cir.1997) (citing W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 75 at 534 (5th ed.1984)). The Supreme Court's unambiguous employment of the traditional standard for negligence in the first element of the affirmative defense clearly signals that it did not intend to predicate Title VII liability for sexual harassment by a supervisor solely upon actual notice to the employer of the harassment.

*agher* to demonstrate that it "exercised reasonable care to prevent ... [Cohen's] sexually harassing behavior." *Burlington,* —— U.S. at ——, 118 S.Ct. at 2270; *Faragher,* —— U.S. at ——, 118 S.Ct. at 2293.

### 2. *Corrective Opportunities*

██ Even if we assume that the University had no actual or constructive notice of Cohen's history of sexual harassment, the University must still demonstrate, in order to make out its affirmative defense, that the Plaintiff unreasonably failed to take advantage of the University's corrective opportunities to remedy the harassment. To this end, the University points out that at the time of the incident it had an adequate anti-harassment policy that was readily available to the Plaintiff, and that she waited three months before taking advantage of it. According to the University, this three month delay represents an unreasonable failure by the Plaintiff to take advantage of the preventative or corrective opportunities provided by the University. The University attempts to bolster this argument by noting that the Plaintiff left IUSB just five months after making her complaint, giving the University's corrective actions little opportunity for success. In response, the Plaintiff simply argues that she used the University's complaint procedure, and thus did everything required of her by the anti-harassment policy.

It is undisputed that the Plaintiff took advantage of the University's anti-harassment policy; the only issue is whether her delay in doing so was unreasonable. Keeping in mind the general rule that "in all cases where reasonableness is an issue, it is up to the fact-finder to apply this standard," *In Matter of Kenneth Leventhal & Co.,* 19 F.3d 1174, 1178 (7th Cir.1994), we believe that given the totality of the circumstances, a jury could find that the Plaintiff's delay in reporting Cohen's harassment was not unreasonable. In other words, the Court cannot say as a matter of law that a sexual assault victim who waits three months to report the incident, under these circumstances, unrea-

sonably failed to take advantage of the University's anti-harassment procedures.[15]

In sum, Cohen's alleged single act of harassment was severe enough to create an actionable hostile environment, and consequently, if proven will subject the University to vicarious Title VII liability. Of course, the newly fashioned affirmative defense may be successful at trial, but at this stage it requires the University to show an absence of genuine issues of material fact as to the University's actual or constructive knowledge of Cohen's previous sexually harassing behavior, as well as the reasonableness of the Plaintiff's use of the corrective opportunities provided by the University. The University has failed to convince the Court that the equivalent of a judgment as a matter of law is warranted on either score. Similarly, summary judgment must be denied to Defendant Cohen on the Plaintiff's § 1983 equal protection claim (*see* note 3 *supra*), rendering Cohen's motion to decline supplemental jurisdiction moot.

### V. CONCLUSION

The University's motion for summary judgment is DENIED as to the Plaintiff's Title VII hostile work environment claim. Cohen's "Motion to Decline Maintenance of Supplemental Jurisdiction Over Count II" is deemed MOOT, and his motion for summary judgment as to the Plaintiff's § 1983 equal protection claim is DENIED.

---

**15.** Of course, the Plaintiff's delay in reporting the incident may also be relevant to the issue of damages at trial. *See Faragher,* —— U.S. at ——, 118 S.Ct. at 2292 ("If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.").