Roderick v. NH Hospital, et al.        CV-98-543-M    01/28/00
                    UNITED STATES DISTRICT COURT

                     DISTRICT OF NEW HAMPSHIRE


Sherry Roderick,
      Plaintiff

      v.                              Civil No. 98-543-M
                                      Opinion No. 2000 DNH 026
New Hampshire Hospital and
Paul G. Gorman,
      Defendants


                        **O R D E R**


      Plaintiff Sherry Roderick (formerly Sherry Davis) brought

this action against defendants New Hampshire State Hospital (the

"hospital") and Paul G. Gorman, the hospital's Superintendent,

alleging that she was sexually harassed by a co-worker while

employed at the hospital.  Plaintiff says that either or both of

the defendants are liable under 42 U.S.C. § 1983 and Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for

failing to prevent the harassment, failing to timely investigate

her sexual harassment complaint, and retaliating against her for

making the complaint.  Plaintiff's complaint also asserts a

number of state-law claims against the hospital.

Defendants moved for summary judgment on all of plaintiff's claims, to which plaintiff objected. For the reasons that follow, defendants' motion is granted in part and denied in part.

Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden shifts to the

2

nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor.  DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegations or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Background

The following facts are either undisputed or presented in the light most favorable to plaintiff. The hospital hired plaintiff as a mental health worker trainee on February 24, 1995. Plaintiff worked the overnight shift on the hospital's Acute Psychiatric Unit ("APU"). Plaintiff met Nick Metalious, a hospital employee who usually worked at the Transitional Housing Unit, on August 13, 1995, while Metalious was filling in on the APU.

Metalious worked on the APU again the next night and, at his request, plaintiff joined him on a patio by the cafeteria during her break. As they talked, Metalious introduced the topic of pornographic movies. Plaintiff attempted to steer the conversation to a different subject. Metalious kissed plaintiff, touched her breast, and attempted to remove her shirt. Plaintiff told Metalious that his conduct was inappropriate and directed him to stop.

Metalious then walked over to the patio fence and, telling plaintiff he wanted to show her something, asked her to join him. Thinking that Metalious was going to point out his new vehicle in

4

the parking lot, a topic they had been discussing, plaintiff complied. Instead, Metalious exposed and forced plaintiff to touch his genitals. Plaintiff pushed Metalious away, told him he should return to his wife, and went back to work.

Approximately half an hour later, Metalious gave plaintiff a handwritten note with his address and phone number on it.[1] The note said "'When you are ready to keep up with the Big Boy I will give you directions. (Ha Ha) Throw away after reading.'" (Compl. at ¶ 10). Plaintiff reported Metalious' conduct to hospital security and Human Resources Administrator Marie Lang that same day.

The hospital began an investigation immediately, obtaining written statements from plaintiff and Metalious within twenty-four hours of the alleged incident. Hospital investigators interviewed plaintiff on August 17, 1995, and obtained statements

---

[1]This account is described in plaintiff's complaint. The report of the hospital investigators' interview of plaintiff indicates that at that time she stated Metalious had given her the note the previous day. The discrepancy is not material and defendants have, for purposes of summary judgment only, presumed that the account of the August 14 incident alleged in plaintiff's complaint is accurate.

5

from other individuals over the ensuing weeks. By letter dated August 21, 1995, James P. Fredyma, Assistant Commissioner of the New Hampshire Department of Health and Human Services, confirmed receipt of plaintiff's harassment complaint and informed plaintiff, <u>inter</u> <u>alia</u>, that she could not be retaliated against for making a complaint. Fredyma also told plaintiff to call the police if Metalious bothered her at home and to contact him, or either of the two investigators he had appointed to the case, if she suffered retaliation by Metalious or other co-workers.

On October 13, 1995, the hospital put Metalious on paid administrative leave pending resolution of the complaint against him. Sometime prior to November 8, 1995, the hospital concluded its investigation. A confidential written report summarized the investigative findings as follows:

> There exists a preponderance of evidence that the respondent has behaved inappropriately in the work environment and has violated the State's Policy on Sexual Harassment. The respondent, on more than one occasion, has engaged female staff in sexually related conversation; has asked personal questions related to female staff sex life; and has shared information about his sex life. There does not exist a preponderance of evidence to substantiate other allegations made by the complainant.

6

It appears that both the complainant and the respondent mutually agreed to certain behaviors that were sexual in nature. State Police found there to be no assaultive or sexually assaultive behavior. The respondent stopped when the complainant told him no. Although there is no basis for civil or criminal charges, the respondent's behavior in this allegation as well as other incidents is not acceptable in the work environment.

(Ex. B to Lang Aff.)

By letters dated November 8, 1995, Fredyma informed plaintiff and Metalious of the investigation's conclusion. Both were told that Fredyma would recommend to Acting Director Sudders that Metalious be formally disciplined. In addition, Fredyma's letter to plaintiff stated the following:

During the course o[f] the investigation into your complaint you disclosed that you participated in some behaviors that were not appropriate in the work environment. I will recommend to Acting Director Sudders that you be scheduled to attend another presentation regarding professional behaviors in the workplace. Clearly understand that my intent toward you is not punitive. It is my intent that all staff learn appropriate workplace behaviors and conduct themselves accordingly.

(Ex. D to Lang Aff.)

On November 15, 1995, Metalious was issued a letter of warning under the Division of Personnel's rules and regulations,

7

Per 1001.08(b), for violating the State's sexual harassment policy. As this was the second warning letter he had received in a two year period, it also served to terminate his employment at the hospital. The first warning, issued on October 10, 1995, charged him with willful insubordination for discussing personal issues with other employees during working hours, despite having been previously reprimanded for such conduct. Metalious had also been issued a letter of warning on July 3, 1995, under Per 1001.03, for calling a female patient a bitch.

Two other incidents in Metalious' employment history should be noted. First, Metalious stated on his application for employment at the hospital that he had no criminal convictions that had not been annulled by a court. In conducting a criminal background check, the hospital discovered a possible juvenile matter and a possible misdemeanor charge or conviction that involved serving alcohol to minor females and temporarily barring their exit from his apartment. It was unclear, however, whether the record had been expunged or whether it should have been considered reportable. In light of the circumstances, and

8

Metalious' forthright response to questioning about the matter, the hospital chose to continue his employment.

The other incident involved a possible personal relationship between Metalious and a female employee, and their having engaged in consensual sexual activity at work. Although no formal staff or patient complaint was made, and reports of the incident were never substantiated, the Director of Transitional Housing counseled both Metalious and the female employee that the hospital would not tolerate such behavior and that it could lead to disciplinary action. Metalious and the woman stopped working together, and that matter was apparently resolved.

Plaintiff's own work history is also at issue in this case. On August 16, 1995, plaintiff was given a letter of warning under Per 1001.03 for a substantiated incident of Class II Abuse. The incident involved plaintiff falling asleep or closing her eyes while on Level I constant observation of a suicidal patient. On November 2, 1995, plaintiff was charged with Class I Abuse of a patient and put on paid administrative leave pending completion of an investigation into the matter. The abuse charge related to

9

plaintiff allegedly having become involved in a plan in which she would receive money from a patient to buy Christmas presents for the patient's nieces, plus additional money to buy presents for her own (i.e., plaintiff's) children.

The complaint investigator's final report, dated November 8, 1995, concluded that the complaint of patient abuse was unsubstantiated. The report stated, in part:

> There is no way of proving Sherry's collaboration, if any, in attempting to obtain a considerable sum of money from [patient]. There was almost certainly no malice involved on either side. Both parties claim to have been motivated by pure good will toward the other. Both parties exhibited remarkably poor judgment. Unfortunately for Sherry Davis, [the patient] behaved more responsibly in the end, expressing her misgivings to appropriate staff members. Had Sherry Davis reported her interactions with [patient] to the nursing supervisor in a timely manner, this situation would not have arisen. Although Sherry states that it was her intention to ask "someone" about this matter, the fact is that she did not do so until after her suspension. Her claim that she was simply following instructions to "go along with" anything said by a patient suffering from borderline personality disorder shows that her understanding of her duties and responsibilities was severely limited. Part of this may be attributed to the fact that she is a relatively new employee, and admittedly naive, but her personnel record shows that she received training and evaluation in New Hampshire Hospital's policy regarding interpersonal boundaries[.] The fact remains that Sherry Davis did not ask for

10

guidance under circumstances that should have alerted
her to the probability of serious trouble.

Patient abuse is not substantiated, however Sherry
Davis did violate hospital policy and used exceedingly
poor judgment in not reporting to her supervisor.

(Ex. B to Sandra M. Davis Aff.)

By letter dated November 16, 1995, the hospital terminated plaintiff's employment for failing to meet the established work standard during her initial probationary period.[2] The letter cited plaintiff's poor judgment, failure to maintain appropriate interpersonal boundaries, and the "closing eyes" incident while on a suicide watch. Plaintiff signed the letter, noting her disagreement with the decision. After receiving an EEOC right to sue letter, plaintiff commenced this suit.

---

[2]It appears that at least some hospital employees are subject to a probationary period at the beginning of their employment. See Ans. at ¶ 6 (alleging that plaintiff was subject to a one year probationary period ending on or about February 24, 1996); Dennis M. D'Ovidio Aff. at ¶ 5 (making reference to Metalious' probationary period).

<u>Discussion</u>

Defendants move for summary judgment on all counts. The court will address plaintiff's federal claims first.

Count I alleges that "[t]he actions of Defendant, New Hampshire Hospital[,] in failing to properly and promptly investigate Plaintiff's complaint of sexual harassment and take prompt, appropriate and effective remedial action constitutes sex discrimination." (Compl. at ¶ 34.) The hospital counters that the undisputed facts show that it responded appropriately to plaintiff's complaint and therefore cannot be held liable under Title VII. The hospital also questions whether the single incident of harassment complained of was severe enough to constitute actionable sexual harassment.

To support a Title VII claim, the harassment "must be sufficiently severe or pervasive to create an abusive working environment." <u>Lipsett v. University of Puerto Rico</u>, 864 F.2d 881, 897-98 (1st Cir. 1988)(internal quotation marks and ellipses

12

omitted).[3]  Whether the alleged harassment meets this test is determined by the trier of fact on consideration of the entire record and the totality of the circumstances.  Id. at 898.

The hospital correctly notes that a single, isolated incident is  rarely sufficient to create an abusive working environment.  See, e.g., Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998).  There are, however, "those exceptional cases in which a single episode of sexual harassment, such as a sexual assault, . . . [is] sufficient to state a claim of a hostile work environment sexual harassment."  Grozdanich v. Leisure Hills Health Ctr., Inc., 25 F. Supp. 2d 953, 969-70 (D. Minn. 1998)(citing cases and finding genuine issue of fact as to

---

[3]The type of harassment plaintiff alleges is often called hostile environment harassment, which "occurs when one or more supervisors or co-workers create an atmosphere so infused with hostility toward members of one sex that they alter the conditions of employment for them."  Lipsett, 864 F.2d at 897. Such harassment is contrasted with the other type of actionable harassment, called quid pro quo, which "occurs when a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate, or punishes that subordinate for refusing to comply."  Id.  As Metalious was plaintiff's co-worker rather than her supervisor, her claim must be one of hostile environment.

13

whether three sexual assaults of plaintiff in a two-hour period created a hostile working environment); see also Fall v. Indiana Univ. Bd. of Trustees, 12 F. Supp. 2d 870, 880 (N.D. Ind. 1998)(noting that "several courts and leading commentators agree that single incidents of severe physical harassment akin to a sexual assault will constitute actionable sexual harassment"). A reasonable jury could find that Metalious' actions as described – kissing and touching plaintiff, and forcing her to touch him – constituted sexual harassment under Title VII. See Fall, 12 F. Supp. 2d at 879-80 (reasonable jury could find that single incident in which harasser lured plaintiff into his office, where he forcibly kissed her and forced his hand down her blouse to grope her breasts, constituted sexual harassment). Thus, plaintiff has raised a genuine issue of material fact sufficient to preclude summary judgment on the issue of the alleged harassment's severity.

The hospital also argues that it cannot be liable for Metalious' harassment of plaintiff because it took prompt and appropriate remedial action. As Metalious was a non-supervisory

14

co-worker of plaintiff, the hospital can only be held liable on a claim that Metalious' conduct toward plaintiff created a hostile environment "if an official representing [the hospital] knew, or in the exercise of reasonable care, should have known, of the harassment's occurrence, unless that official can show that he or she took appropriate steps to halt it." Lipsett, 864 F.2d at 901 (addressing Title IX claim but looking to analogous Title VII standards). The hospital highlights the following undisputed facts and necessary inferences: (1) the incident complained of was the first instance of plaintiff being harassed by Metalious, so the hospital could not have known prior to that incident that Metalious was harassing plaintiff; (2) the hospital initiated a prompt investigation into the matter, within days of the incident; (3) the hospital referred the allegations of possible sexual assault to the New Hampshire State Police;[4] (4) the hospital ensured that Metalious never worked with plaintiff

---

[4]Notes of the hospital investigators' interview of plaintiff suggest that plaintiff herself contacted the State Police. She does not appear to dispute, however, that hospital security also reported her complaint to State Police. (See Pl.'s Br. at 4.)

15

again; (5) the hospital removed Metalious from the workplace, putting him on administrative leave and (6) at the conclusion of the investigation, the hospital fired Metalious.

Plaintiff argues that the remedial action taken following her complaint was insufficient, because she was not informed that she would no longer be working with Metalious, and, so, was apprehensive about that possibility, and because the hospital failed to complete its investigation within thirty days as required under its own policy. Plaintiff also argues that the hospital had knowledge of Metalious' previous harassment of other employees and that it failed to take appropriate remedial steps that would have prevented plaintiff's harassment from occurring in the first place.

Plaintiff made her sexual harassment complaint to the hospital on August 14, 1995. She was notified of the conclusion of the hospital's investigation nearly three months later, by letter dated November 8, 1995. Although Metalious was absent

16

from work from approximately August 31 to September 13, 1995,[5] was put on administrative leave on October 13, 1995, and fired on November 15, 1995, plaintiff was never assured that she would not have to work with him again. Plaintiff does not contend, however, that she was harassed by, or had any contact with, Metalious at work after August 14, 1995.

The Eighth Circuit recently identified several factors that ought to be considered when evaluating an employer's response to a complaint of harassment.

> Factors in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment.

Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999)(citations omitted).

With respect to the length of time the hospital took to investigate this incident, the court notes that a three month

---

[5]Metalious was out on medical leave and was hospitalized temporarily at some point during that time.

17

investigation was considered prompt in <u>Waymire v. Harris County,</u> <u>Texas</u>, 86 F.3d 424, 429 (5th Cir. 1996).  Courts realize that "[o]rdinarily, an organization requires time to respond to embarrassing, emotional and often litigation-spawning claims of sexual harassment."  <u>Dornhecker v. Malibu Grand Prix Corp.</u>, 828 F.2d 307, 309 (5th Cir. 1987).  This requirement is heightened where, as here, there were no witnesses to the incident and the alleged harasser both denied any wrongdoing and exhibited potential hostility toward the employer as a result of the accusation.  <u>See</u> <u>Grozdanich</u>, 25 F. Supp. 2d at 977 (recognizing that an employer in such situations faces "a high probability of liability for both sexual harassment and wrongful termination").[6]

That the hospital required three months to fully investigate plaintiff's complaint does not preclude finding its response to have been prompt as a matter of law.  This is particularly so

_____

[6]When interviewed by hospital investigators on August 17, 1995, Metalious disputed plaintiff's version of the incident, stating that they had hugged and kissed, but that it had been consensual.  Metalious also stated that he felt violated by the complaint and believed his rights were not being protected.  (<u>See</u> Ex. 3 to Pl.'s Br.)

18

where, as in Waymire, "[t]he investigation originally moved quickly." Waymire, 86 F.3d at 429. The hospital obtained written statements from plaintiff and Metalious within twenty-four hours of the incident, began interviewing witnesses within three days, and confirmed in writing both that it had plaintiff's complaint and that it had appointed an investigative team. Thus, plaintiff was assured within days of the incident that her complaint was being taken seriously and was being acted upon.

Plaintiff nevertheless asserts that the hospital's investigation was not timely because it did not comply with the mandate in the State's sexual harassment policy that "[i]nvestigations shall be completed and a written report issued within thirty (30) days of the receipt of the complaint." (Lang Aff. Ex. H). Plaintiff points to no authority for the proposition that failure to meet self-imposed requirements more specific or stringent than those imposed by Title VII should nevertheless be held actionable under Title VII, nor does she suggest any policy concerns that might warrant such a rule. The hospital's self-imposed thirty day investigation period is

19

enforceable, if at all, under contract principles. See, e.g., Corluka v. Bridgford Foods of Ill., Inc., 671 N.E.2d 814, 818-19 (Ill. App. Ct. 1996) (finding a harassment policy that "state[d] a promise by defendant to end any harassment employees may experience" constituted a contract); Finnane v. Pentel of America, Ltd., 43 F. Supp. 2d 891, 901 n.2 (N.D. Ill. 1999) (questioning Corluka on whether there existed consideration for a contract that imposed no greater duties on defendant than those required by law, but stating that there would be consideration where a policy dealt with "matters beyond the scope of Title VII" such as "prompt, confidential investigation and duty to discipline and/or terminate"). In fact, plaintiff asserts, as a pendent state law claim in Count III, that the hospital's failure to complete its investigation within thirty days, as required under its own policy, breached her employment contract. Accordingly, that alleged contractual breach will be considered when Count III is addressed. But, with regard to plaintiff's Title VII claim, the hospital's response to her complaint was timely as a matter of law.

20

Plaintiff also argues that the hospital's response was deficient because it left her wondering whether she would have to work with Metalious again. In its answers to plaintiff's interrogatories, the hospital stated that after it received her complaint "[Metalious] was not allowed to work with the plaintiff in the Acute Psychiatric Facility." (Ex. 12 to Plf.'s Obj. to Defs.' Mot. for Summ. J.) Plaintiff concedes that Metalious did not work with her while her complaint was under investigation. (See Pl.'s Br. at 3.)

While the hospital could have, and probably should have, reassured plaintiff by specifically telling her that Metalious would no longer work with her, "Title VII requires only that the employer take steps reasonably likely to stop the harassment." Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 536 (7th Cir. 1993). It is undisputed that the hospital's actions did effectively and promptly stop Metalious' harassment of plaintiff. That is sufficient for Title VII purposes, notwithstanding plaintiff's continued apprehension. (Of course, plaintiff could have asked for reassurance as well, as any reasonable person

21

likely would have done.)  See Skidmore v. Precision Printing and Pkg., Inc., 188 F.3d 606, 616 (5th Cir. 1999) (employer's remedial action met Title VII standards where harasser's offensive conduct ceased after he was warned and transferred to a new shift, even though plaintiff "testified that she remained uncomfortable").  The court therefore holds as a matter of law that the hospital took prompt and appropriate remedial action in response to plaintiff's complaint.

Plaintiff also argues, however, that the hospital is liable under Title VII for failing to properly respond to previous complaints about Metalious.[7]  Plaintiff argues that Metalious'

_____

[7]Count I of plaintiff's complaint, captioned "sex discrimination," appears to address only the hospital's allegedly inadequate response to plaintiff's complaint of harassment. Plaintiff's brief confirms this reading:
> The gist of [Count I] is that Defendant did not act properly and promptly after [plaintiff's] complaint was made.  Count V goes to the issue of Defendant failing to maintain a safe working environment and failing to adequately train and supervise employees, which if done properly, the sexual harassment could have been prevented.

(Plf.'s Br. at 10.)  Count V, however, is a claim brought under 42 U.S.C. § 1983, not Title VII.
Nevertheless, in discussing the Title VII claim in her brief, plaintiff argues that the hospital's awareness of prior

22

harassment of her could have been avoided if the hospital had taken appropriate remedial action when prior complaints were made by others.

The hospital counters that the information it had about Metalious - namely, that he may (or may not) have misrepresented his criminal record on his employment application, that he may have engaged in consensual sexual activity with a fellow employee while at work, and that he had been previously reprimanded for calling a patient "a bitch" - was insufficient to put it on notice that Metalious would likely sexually harass a co-worker in the manner described. The hospital fails to address, however, plaintiff's critical factual allegation that "at least one prior

---

incidents involving Metalious "either gave the State cause to severely reprimand Metalious sufficiently to change his behavior or cause to terminate him. Had either occurred, the State could have prevented the August 14, 1995 sexual assault and harassment from occurring." (Plf.'s Br. at 12.) Moreover, while noting the apparently limited scope of Count I, defendants address the broader potential claim in their brief. The court will therefore treat Count I as also alleging that the hospital's failure to act on prior complaints against Metalious gave rise to Title VII violations.

complaint has been made by another employee about Metalious'
sexually harassing conduct at work."  (Compl. at ¶ 11.)

Plaintiff bases her claim on the affidavit of Gary A.
Prescott, which describes an incident that occurred in late April
or early May, 1995, while Prescott was working at the Philbrook
Children's Center.  Prescott stated that he overheard a
conversation between Metalious and a co-worker, Rebecca Pellowe,
in which Metalious commented on his sex life with his wife.
Metalious and Pellowe went into another room, and when Pellowe
returned, she was upset and stated she was leaving.  Prescott
believes he heard Metalious ask Pellowe to engage in a sex act
with him.  After discussing the incident with Pellowe the next
day, Prescott wrote up a complaint against Metalious and "filed
it with the complaint office."  (Prescott Aff.)[8]

Defendants submitted the affidavit of Marie Lang, in which
she states that she personally searched or instructed others to

_____

[8]Plaintiff represents that Pellowe also filed a complaint at
the time of the incident, but there is no affidavit from Pellowe
in the record or other admissible evidence to show that a
complaint was filed by Pellowe.

24

search hospital records for any prior sexual harassment complaints against Metalious. Lang averred that no record of any prior complaint, and in particular any prior complaint by Prescott or Pellowe, was found. Dennis M. D'Ovidio, the Director of Transitional Housing, also stated in his affidavit that as far as he knew, no complaint of sexual harassment, prior to plaintiff's, was made against Metalious while he worked in Transitional Housing. These averments, however, do not disprove Prescott's testimony that he filed a complaint and, to the extent they cast doubt on that testimony, they generate a factual dispute that cannot be resolved on summary judgment. Assuming that a complaint was filed as Prescott claims, there is no evidence as to what, if any, remedial action was taken by the hospital.[9]

---

[9]Interestingly, the hospital investigators' notes of an interview with Metalious report that "Metalious stated that Dennis D'Ovidio, his boss, once called him in about a complaint made by a woman at work against him. Metalious stated that nothing happened, but that there were a lot of rumors." (Plf.'s Ex. 3 to Obj. to Defs.' Mot. for Summ. J.) There is no indication of who the complainant was or to what incident the complaint referred.

Plaintiff has raised a genuine issue of material fact as to whether the hospital had prior knowledge of Metalious' harassment of female co-workers and whether it took appropriate action given that knowledge.  Thus, even though the hospital properly handled plaintiff's sexual harassment complaint, its motion for summary judgment must be denied as to Count I.  See Brooks v. H. J. Russell & Company, 66 F. Supp. 2d 1349 (N.D. Ga. 1999) (employer's motion for summary judgment denied where employer responded appropriately to plaintiff's complaint but genuine issue of material fact existed as to whether employer knew of, yet failed to address, previous incidents involving the harasser and other employees); Munn v. Mayor and Aldermen of the City of Savannah, Ga., 906 F. Supp. 1577, 1584 (S.D. Ga. 1995) (same).

Plaintiff argues that the court should decline to consider the remaining issues addressed in defendants' motion as they should have been raised in a motion to dismiss.  Plaintiff contends that defendants' motion is essentially a motion to dismiss brought under the guise of a summary judgment motion and that because it was filed almost five months after the deadline

26

for motions to dismiss set in the court's pretrial scheduling order, it is untimely.  The court disagrees.

First, to the extent defendants' remaining arguments rely on materials outside the pleadings, they were required to be raised in a motion for summary judgment.  However, even arguments that do not require the court to look beyond the pleadings are not precluded from summary judgment disposition: "Of course, a summary-judgment motion may be made on the basis of the pleadings alone, and if this is done it functionally is the same as a motion to dismiss for failure to state a claim or for a judgment on the pleadings."  10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2713 at 222-23 (3d ed. 1998).  Defendants' arguments for judgment are properly presented.  See Baker v. Pfeifer, 940 F. Supp. 1168, 1173 n.4 (S.D. Ohio 1996) (court not detained by argument that defendants should have filed a motion for judgment on the pleadings rather than a motion for summary judgment).

In Counts II and IV, plaintiff alleges that the hospital retaliated against her, in violation of Title VII, for reporting

the sexual harassment by Metalious.  She says the hospital retaliated by requiring that she attend a presentation regarding appropriate workplace behaviors (Count II) and by terminating her employment (Count IV).

In the absence of direct evidence of retaliation, plaintiff has the initial burden to establish a prima facie case by showing the following: "[1] protected participation or opposition under Title VII known by the alleged retaliator; [2] an employment action or actions disadvantaging persons engaged in protected activities; and [3] a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions."  Hazel v. U.S. Postmaster Gen., 7 F.3d 1, 3 (1st Cir. 1993) (internal quotation marks and some internal brackets omitted).  Plaintiff's establishment of a prima facie case shifts the burden of production to the defendant "to articulate a plausible, legitimate, and nondiscriminatory justification for the employment decision."  Id.  The burden of persuasion, however, remains at all times with the plaintiff. Id.  Thus, once the employer offers a nondiscriminatory reason

28

for the challenged action, the presumption of discrimination raised by plaintiff's prima facie case disappears and the plaintiff is left with the burden of proving the ultimate issue - that the challenged action was taken in retaliation for plaintiff's engaging in protected activity. See id.; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08 (1993). Plaintiff may meet this burden by showing that the employer's proffered reason was a pretext for retaliation - that is, that "the proffered reason was not the true reason for the employment decision and that [retaliation] was." St. Mary's Honor Center, 509 U.S. at 508 (citation and internal quotation marks omitted).

The hospital first argues that plaintiff has failed to establish a prima facie case with respect to Count II because the direction that she attend a presentation on professional behavior in the workplace does not constitute an adverse employment action sufficient to support a retaliation claim. The court agrees. The Court of Appeals for the First Circuit has noted that Title VII's retaliation provision "encompasses a variety of adverse employment actions, including demotions, disadvantageous

29

transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998). It does not, however, cover all employment actions that a plaintiff may find objectionable. The action must "at a minimum, impair or potentially impair the plaintiff's employment in some cognizable manner." Nelson v. University of Maine Sys., 923 F. Supp. 275, 281 (D. Me. 1996); see also Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) (noting that Title VII's retaliation provision should arguably be read in conjunction with 42 U.S.C. § 2000e-2(a), which prohibits discrimination with respect to "'compensation, terms, conditions, or privileges of employment'").

Requiring plaintiff to attend a presentation on professional workplace behavior does not rise to the level of adverse employment action. The District Court for the Eastern District of Pennsylvania addressed a similar situation in Harley v. McCoach, 928 F. Supp. 533 (E.D. Pa. 1996). There the employer, as one of the remedial actions taken in response to plaintiff's

30

complaints of racial and sexual harassment, required plaintiff, along with all of the employees in her department, to attend a refresher course on sexual harassment taught by one of her alleged harassers. The court concluded that "[w]hile [plaintiff] may have found these actions objectionable, we cannot say that they adversely affected her employment relationship with [her employer]." Id. at 542. Plaintiff's claim in this case similarly fails. Therefore, defendants' motion for summary judgment is granted as to Count II.

In Count IV, plaintiff alleges additional retaliatory action in the form of termination of her employment. Termination clearly constitutes an adverse employment action. Furthermore, the court will presume that the temporal proximity between the filing of plaintiff's complaint with the New Hampshire Human Rights Commission on November 2, 1995, and her termination on November 16, 1995, is sufficient evidence of causation to at least establish a prima facie case. See Oliver v. Digital Equipment Corp., 846 F.2d 103, 110 (1st Cir. 1988) ("A showing of discharge soon after the employee engages in an activity

31

specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation.").

In accordance with the burden-shifting framework outlined above, the hospital must now articulate a legitimate, non-discriminatory reason for the adverse employment action. The hospital submitted affidavits from Linda Flynn, plaintiff's former supervisor, and Sandra M. Davis, the Assistant Director of Nursing at the hospital. Both affiants stated that they participated in the decision to terminate plaintiff and that her sexual harassment complaint played no part in that decision. Sandra M. Davis further stated that plaintiff was fired for failing to meet the required work standard while on probationary status. Specific instances of such failure included falling asleep while on a suicide watch and exercising poor judgment in becoming involved in a personal financial arrangement with a patient. This showing is sufficient to meet the hospital's burden of production. See, e.g., Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (defendant successfully

32

rebutted plaintiff's prima facie case with supervisor's testimony that plaintiff was fired for performance reasons and that his engaging in protected activity was not considered).

Plaintiff attempts to show that the reasons given for her termination were pretextual by arguing that the sleeping incident did not give the hospital sufficient cause to terminate her at that time and that she was "cleared of any wrongdoing" in the gift-buying incident when the patient abuse complaint was determined to be unsubstantiated. (Pl.'s Br. at 16.) The court cannot agree with plaintiff's interpretation of either the undisputed facts or the law. Far from having been "completely exonerated" in the gift-buying incident, plaintiff was found to have "violate[d] hospital policy and used exceedingly poor judgment in not reporting to her supervisor," notwithstanding that no patient "abuse" was found. (Ex. B to Sandra M. Davis Aff.) Plaintiff does not dispute that she failed to notify her supervisor of the gift-buying incident or that she fell asleep while on a suicide watch. While plaintiff may dispute the egregiousness of these lapses, "[i]t is not enough for the

33

plaintiff to show that the employer made an unwise business decision, or an unnecessary personnel move." Gray v. New England Tel. & Tel. Co., 792 F.2d 251, 255, 256 (1st Cir. 1986) (plaintiff failed to present jury question of pretext where he failed to produce evidence that his employer "did not in fact believe that he was violating [company policies]").

Here the hospital stated that it fired plaintiff for failing to meet established work standards, including failing to use good judgment and follow hospital policy. Plaintiff has not shown that the hospital did not actually believe that she exhibited these faults. Thus, plaintiff has failed to present a genuine issue of material fact regarding pretext. The defendants' motion for summary judgment is granted as to Count IV.

Count V of plaintiff's complaint asserts a claim under 42 U.S.C. § 1983, alleging that the hospital and Gorman denied her due process and equal protection by failing to promptly investigate her sexual harassment complaint, by failing to keep the working environment safe, and by failing to properly train and supervise hospital employees. The defendants claim

34

entitlement to summary judgment on grounds that the hospital, as a state agency, is not a person subject to suit under § 1983; that the undisputed facts do not support plaintiff's claim; that plaintiff failed to allege facts connecting Gorman to her alleged harassment; and that, in any event, Gorman is entitled to qualified immunity.

The hospital cites Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989), to support its defense to the § 1983 claim. In Will, the Supreme Court held that "a State is not a person within the meaning of § 1983." Id. at 64.[10] Plaintiff does not dispute, and indeed alleges in ¶ 4 of her complaint, that the hospital "is a department of the State of New Hampshire." Thus, under Will, the hospital is entitled to summary judgment on Count V.

Plaintiff also seeks to draw support from Will's language: "Of course a state official in his or her official capacity, when

---

[10]Section 1983 itself subjects to liability "[e]very person who, under color of" state law, deprives any citizen or person within the jurisdiction of the United States of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C.A. § 1983 (West Supp. 1999).

35

sued for injunctive relief, would be a person under § 1983 because official capacity actions for prospective relief are not treated as actions against the State." Will, 491 U.S. at 71 n.10. Plaintiff argues that because she prays for prospective relief, including reinstatement and injunctions against future discrimination, her § 1983 claim against the hospital and Gorman are not barred. The court disagrees.

First, the court questions whether plaintiff has sued Gorman in his official capacity at all. The caption of plaintiff's complaint does not specify the capacity in which Gorman is named as a defendant. Nor does the body of her complaint evince plaintiff's intent to sue Gorman as superintendent of the hospital. On the one hand, the complaint identifies Gorman by his official title, alleges that he acted under color of state law, and alleges that he and the hospital had a policy or custom of violating female employees' due process and equal protection rights. These allegations, in an otherwise ambiguous complaint, are indicative of an official capacity suit. See, e.g., Kolar v. County of Sangamon of the State of Illinois, 756 F.2d 564, 568

36

(7th Cir. 1985) (clarifying that "where a complaint alleges that the conduct of a public official acting under color of state law gives rise to liability under Section 1983, we will ordinarily assume that he has been sued in his official capacity and only that capacity").

On the other hand, while it never mentions the words "official capacity," the complaint expressly declares that Gorman "is being sued in his individual capacity." (Compl. at ¶ 5.) See Saxner v. Benson, 727 F.2d 669, 673 (7th Cir. 1984) (finding defendants not sued in official capacities where "[i]n addition to the absence of any allegation that the defendants were acting in their official capacities, it is specifically alleged . . . [in the complaint] that 'All defendants are sued in their individual capacities'"), aff'd sub nom. Cleavinger v. Saxner, 474 U.S. 193 (1985). The failure to name Gorman in his official capacity is fatal to plaintiff's claims for injunctive relief. See Poe v. Massey, 3 F. Supp. 2d 176, 176 (D. Conn. 1998) ("Claims for prospective relief against a state officer may be asserted only against the officer in her official capacity.").

37

Moreover, plaintiff's claims for injunctive relief fail as a matter of law. See id. Her prayer for reinstatement cannot be granted because she was terminated for a legitimate, nondiscriminatory reason. See Hite v. Biomet, Inc., 53 F. Supp. 2d 1013, 1026 n.15 (N.D. Ind. 1999) (noting that "since this court has concluded that Hite's termination is valid, reinstatement is not an appropriate remedy"). Her claims for injunctive relief aimed at curbing future discriminatory and/or harassing behavior fail because she no longer has a stake in what happens at the hospital. See e.g., Roth v. United States, 952 F.2d 611, 613 (1st Cir. 1991) (noting that after plaintiff resigned from defendant's employ, she no longer had standing to enjoin her supervisor's actions "in order to protect others or vindicate the public weal").

Count V also fails as a matter of law to the extent that it attempts to hold Gorman liable, under § 1983, in his individual capacity. "A supervisor may be found liable [under § 1983] only on the basis of h[is] own acts or omissions." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir.

38

1989)(internal quotation marks omitted). Plaintiff's complaint fails to recount a single act or omission by Gorman, alleging only that Gorman "had supervisory responsibility over the entire operation" of the hospital (Compl. at ¶ 5) and that he and the hospital "had a policy and/or custom of depriving female employees" of constitutional rights (Compl. at ¶ 28). "Without alleged facts tying [Gorman] personally, by reason of his own cognizable action or inaction, into the conduct which harmed plaintiff, . . . [Gorman] cannot be held liable [under § 1983] for the actions of his subordinates." Guzman v. City of Cranston, 812 F.2d 24, 26 (1st Cir. 1987). Thus, Gorman is entitled to summary judgment with respect to Count V in his individual capacity.

Counts III, VI and VIII of plaintiff's complaint assert state law claims against the hospital for breach of contract, negligence, and malicious termination, respectively. The hospital argues that these claims are barred by the Eleventh Amendment and sovereign immunity. The court agrees. The Eleventh Amendment provides: "The Judicial power of the United

39

States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  The Supreme Court has long recognized that the amendment's "significance lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III."  <u>Pennhurst State School & Hosp. v. Halderman</u>, 465 U.S. 89, 98 (1984).  Accordingly, the amendment has been interpreted more broadly than its limited terms would ordinarily suggest.  The Supreme Court has held, for instance, that the amendment bars a suit in federal court brought against a state by one of its own citizens.  <u>See</u> <u>id</u>.  The Eleventh Amendment also bars pendent claims brought in a suit over which the federal court otherwise has jurisdiction.  <u>See</u> <u>id</u>. at 918.

As sovereign immunity bars suit against a state without its consent, the state may, by its consent to suit, waive the immunity.  <u>See</u> <u>id</u>. at 98-99.  Such consent must be "unequivocally expressed," however, <u>id</u>. at 99, and "the Court consistently has held that a State's waiver of sovereign immunity in its own

courts is not a waiver of the Eleventh Amendment immunity in the federal courts," id. at 99 n.9. The hospital argues that the State of New Hampshire has not waived its Eleventh Amendment immunity to any of the pendent state claims brought by plaintiff. Before addressing each claim individually, the court notes that in N.H. Rev. Stat. Ann. § 99-D:1 (1990) the New Hampshire legislature adopted the doctrine of sovereign immunity as the law of the state, "except as otherwise expressly provided by statute."

Count III alleges breach of contract. In N.H. Rev. Stat. Ann. § 491:8, New Hampshire partially waived its sovereign immunity as to claims based on express or implied contracts. See Morgenroth & Associates, Inc. v. Town of Tilton, 121 N.H. 511, 514 (1981). That statute, however, grants the power to enter judgment against the state, on a contract claim, only to the state's own superior court. New Hampshire's waiver of immunity in its own courts does not waive its Eleventh Amendment immunity to suit in federal court. See Metcalf & Eddy, Inc. v. Town of Gorham, New Hampshire, 587 F. Supp. 32, 34 (D.N.H. 1984) (finding

41

that "the State of New Hampshire has not waived its Eleventh Amendment immunity from suit under RSA 491:8").  Thus, the hospital in entitled to summary judgment on Count III.

Count VI, alleging negligence, must be dismissed for similar reasons.  Claims for personal injury may be brought against the state under N.H. Rev. Stat. Ann. § 541-B:9.  Jurisdiction over such claims, however, is granted to the board of claims, established in N.H. Rev. Stat. Ann. § 541-B:2, and/or the state superior court, depending on the amount in controversy.  The statute nowhere expressly consents to suit in federal court.  Thus, the hospital is entitled to summary judgment on Count VI.[11]

Count VII purports to state a claim for malicious termination constituting retaliation under N.H. Rev. Stat. Ann. § 354-A:19 and Title VII.  However, N.H. Rev. Stat. Ann. ch. 354-A

---

[11]The foregoing discussion provides sufficient answer to plaintiff's argument that "[i]f the State has consented to suit pursuant to RSA 491 and 541-B, then there is no reason that suit cannot go forward in the Federal forum."  (Pl.'s Br. at 23.) While plaintiff expresses a laudable desire to avoid the "waste of judicial time and resources" involved in litigating in more than one forum, (Pl.'s Br. at 23), considerations of judicial economy do not trump Eleventh Amendment immunity.

"does not create a private right of action for individuals aggrieved by unlawful discrimination," Carparts Distribution Ctr. v. Automotive Wholesaler's Ass'n of N.E., Inc., 987 F. Supp. 77, 83 (D.N.H. 1997) (internal quotation marks omitted), and the court has already determined that plaintiff's Title VII retaliatory discharge claim fails as a matter of law.

Plaintiff nevertheless argues that her wrongful termination claim is brought not under N.H. Rev. Stat. Ann. ch. 354-A, but under New Hampshire case law including Monge v. Beebe Rubber Co., 114 N.H. 130 (1974), and Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915 (1981). This argument also fails. The rule adopted in Monge and refined in Howard v. Dorr Woolen Co., 120 N.H. 295 (1980) essentially prohibits the termination of an at will employee that is motivated by malice, bad faith, or retaliation and that is effected because the employee "performed an act that public policy would encourage, or refused to do that which public policy would condemn." Cloutier, 121 N.H. at 920 (quoting Howard, 120 N.H. at 297). The rule is usually stated to be based on the implied covenant of good faith found in every contract,

43

see id., although the cause of action is sometimes expressed as the tort of wrongful discharge, see id. at 925 (Bois, J., dissenting); cf. Monge, 114 N.H. at 130 (specifying that the action was brought in assumpsit for breach of an oral employment contract). In either case, plaintiff's claim is barred because, as noted above, New Hampshire has not consented to be sued in tort or contract in federal court. Thus, the hospital is entitled to summary judgment on Count VII.

Defendants finally argue that plaintiff's claims for declaratory and injunctive relief are moot. As stated in the discussion of plaintiff's § 1983 claim, the court agrees with respect to all injunctive relief requested by plaintiff. In addition, the request for declaratory judgment on her § 1983 claim must fail along with the substance of that claim. Plaintiff's Title VII claim based on the hospital's failure to remedy prior harassment, however, survives this motion for summary judgment given the undeveloped record. Thus, her request for a declaration that the hospital has violated Title VII is not moot.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Counts II, IV and V, and Count I to the extent it challenges the hospital's response to plaintiff's own harassment complaint, are dismissed with prejudice. Counts III, VI and VII are dismissed without prejudice to plaintiff asserting them, if she can, in state court or before the board of claims. Count I survives to the extent it bases a harassment claim on the hospital's prior knowledge of and failure to adequately respond to the likelihood that Metalious would sexually harass female co-workers.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 28, 2000

cc:  Brian T. Stern, Esq.
     Nancy J. Smith, Esq.